711 P.2d 1207

Kevin RUTLEDGE, Plaintiff-Appellant,

v.

ARIZONA BOARD OF REGENTS, Arizona State University, Frank Kush, William Maskill and Gary Horton, Defendants-Appellees.

No. 1 CA–CIV 6282.

Court of Appeals of Arizona, Division 1, Department A.

May 23, 1985.

Review Denied Sept. 24, 1985.

Wentworth & Lundin by Robert Ong Hing, Michael W. Herzog, Phoenix, for plaintiff-appellant.

Gallagher & Kennedy by Michael L. Gallagher, Kevin E. O'Malley, Phoenix, for defendant-appellee Arizona Bd. of Regents.

Snell & Wilmer by Warren E. Platt, Robert J. Gibson, Shirley J. Wahl, Phoenix, for defendant-appellee Kush.

Robert K. Corbin, Atty. Gen. by Richmond K. Turner, Asst. Atty. Gen., Phoenix, for defendants-appellees Maskill and Horton.

## OPINION

OGG, Judge.

This appeal arises from the alleged assault of former Arizona State University (A.S.U.) football player Kevin Rutledge (Rutledge) by former head football coach Frank Kush (Kush). Rutledge filed suit against Kush, A.S.U., the Arizona Board of Regents (Board), and various other A.S.U. officials.

## FACTS

We begin by setting forth a brief summary of the facts giving rise to the lawsuit. Rutledge was a member of the 1978 A.S.U. football team. He was a sophomore, having been on the varsity team the previous year as a freshman. Prior to the start of the 1978 season, Rutledge was considered the team's starting punter and was also a back-up defensive back. Apparently Kush was not satisfied with Rutledge's performance during pre-season camp, resulting in Kush ordering that Rutledge was not to suit-up for the first game of the 1978 season. Kush asserted at trial that the reason he did not have Rutledge suit-up for the first game was that he hoped that Rutledge would become irritated and thus motivate himself to concentrate and perform better. Rutledge asserted that the reason he did not suit-up was that he was to be "red-shirted" [1] during the 1978 season, due to the physical effects of a January, 1978 automobile accident. Kush denied that he knew of Rutledge's alleged injuries or that Rutledge was to be red-shirted because of his alleged injuries.

Rutledge did suit-up and punt in the next six games, including the October 28th game at the University of Washington. A.S.U. played an exceptionally poor game against Washington and Rutledge was no exception. Rutledge testified that, after a third consecutive poor punt late in the game, Kush approached Rutledge while he was standing on the sidelines, grabbed the face mask of Rutledge's helmet, pulled it sideways so that Rutledge was facing Kush, began shaking the face mask and calling Rutledge various obscenities, and finally delivered an uppercut punch to Rutledge's face. Rutledge testified that he suffered a split lip as a result of the punch. Kush denied having punched Rutledge and testified that he could not recall if he had grabbed Rutledge's face mask.

Rutledge asserted that after the Washington game, Kush and assistant coach William Maskill did everything they could to force Rutledge to leave A.S.U. and forfeit his scholarship. Rutledge did in fact leave A.S.U., transferring to the University of Nevada at Las Vegas prior to the 1979 football season. Rutledge maintained at trial that he was forced to leave A.S.U. as a result of "constant physical and mental abuse" from both Kush and Maskill. Kush denied pressuring Rutledge into leaving the team.

Rutledge filed a complaint in Maricopa County Superior Court on October 22, 1979. Named as defendants in the lawsuit were: (1) the Board of Regents; (2) A.S.U.; (3) Frank Kush; (4) William Maskill; (5) Gary Horton; and (6) Fred Miller. On January 11, 1980, the complaint was amended to join as defendants in the action Frances Kush, Mary Helen Maskill, Jean Miller, John Schwada, Jane Doe Schwada, George Hamm and Jane Doe Hamm.

Rutledge's first amended complaint contained an allegation (Count V) that various defendants had violated 42 U.S.C. §§ 1983 and 1985(2). On May 30, 1980, the trial court granted defendants' motion to dismiss Count V. Rutledge subsequently filed his second amended complaint, setting forth nine claims for relief.

Count I of the second amended complaint alleged that Kush had assaulted and battered Rutledge during the October 28, 1978 football game against Washington. Count II alleged that Kush and Maskill intentionally interfered with Rutledge's contractual and advantageous business and educational relationship with A.S.U. Count III accused both Kush and Maskill of conspiracy to interfere with Rutledge's contractual and advantageous business and educational relationship with A.S.U. Count IV alleged that Kush misrepresented the availability of football scholarships during the 1977–1978 school year. Count V set forth a

1. When a player is "red-shirted", he does not participate in his team's scheduled games during the year. If he is physically able, however, he may still continue to practice with the team.

By "red-shirting" for a year a player retains his eligibility to play varsity ball his fifth year in college, if he has not yet graduated at that time.

claim for defamation against Kush. Count VI alleged that Kush and Maskill were liable for intentional infliction of emotional distress. Count VII was based upon *respondeat superior* and was asserted against A.S.U., the Board of Regents, Miller, Hamm and Schwada for the actions of Kush and Maskill. Count VIII alleged that the Board of Regents breached its contract with Rutledge by allowing Kush and Maskill to coerce Rutledge into leaving A.S.U., thereby forfeiting his scholarship. Count IX was asserted against the Board of Regents, Miller, Schwada and Hamm for negligent supervision of Kush. Rutledge sought compensatory and punitive damages under all counts except Counts VII (*respondeat superior*), VIII (breach of contract), and IX (negligent supervision), in which he sought only compensatory damages.

Prior to trial, Counts III (conspiracy to breach contract) and VI (intentional infliction of emotional distress) against Kush and Maskill were dismissed following motions for summary judgment. Additionally, the Board of Regents was granted summary judgment on Count IX (negligent supervision).[2] Defendants Miller were dismissed from the lawsuit on December 9, 1980.

Thus, following pretrial rulings, the following issues remained for trial:

1. As to Kush:
 (a) Assault and battery;
 (b) Intentional interference with contractual relations;
 (c) Defamation;
 (d) Misrepresentation.
2. As to Maskill:
 Intentional interference with contractual relations.
3. As to the Board of Regents:
 (a) Breach of contract;
 (b) Liability under *respondeat superior* for the actions of Kush and Maskill.
4. As to Hamm[3] and Schwada:

Negligent supervision of Kush.

Trial commenced on January 26, 1981. On February 12, 1981, the trial court ordered that the trial be bifurcated. The court ordered that the claims of assault and battery, defamation and misrepresentation against Kush and the Board of Regents be tried first. The remaining issues of intentional interference with contract, breach of contract and negligent supervision were ordered tried after the jury returned a verdict on the first three claims. The trial court ordered that the jury would be permitted to consider all evidence presented in the first phase of the trial during their deliberations in the second phase of the trial.

On March 17, 1981, the trial court granted Kush's motion for a directed verdict on the defamation claim (Count V). On March 20, 1981, the jury returned verdicts in favor of Kush and the Board of Regents on the remaining claims of assault and battery and misrepresentation. Phase two of the trial resulted in jury verdicts in favor of all defendants on all remaining claims. Rutledge's subsequent motion for a new trial was denied. Pursuant to A.R.S. § 12–341.-01(A), the trial court awarded the Board of Regents $20,000.00 in attorneys' fees.

Rutledge raises several issues for our review. We discuss each issue as set forth below.

## BIFURCATION

As previously noted, the trial court ordered that the claims of assault and battery, defamation and misrepresentation be tried prior to the claims of intentional interference with contract, breach of contract and negligent supervision. *See* Rule 42(b), Arizona Rules of Civil Procedure. The trial court's rationale for bifurcating trial of Rutledge's claims was set forth in a minute entry as follows:

IT IS ORDERED that *evidence of alleged mistreatment of other football*

---

**2.** Rutledge has not appealed from these judgments.

**3.** Rutledge acknowledges in his reply brief that his claims against Hamm have not been preserved on appeal.

*players is admissible* against the Defendant Kush on the Plaintiff's cause of action *for interference with contractual relationship* to prove that the Defendant Kush's coaching methods may have resulted in breaches of contract and that the Defendant Kush knew or should have known that such behavior would result in Plaintiff abandoning his scholarship and on the issue of punitive damages for interference with contractual relationship. *It is not admissible under any other theory in connection with any claims for assault, defamation or misrepresentation or punitive damages relating to such theories. LaFrentz v. Gallagher,* 105 Ariz. 255, 462 P.2d 804 (1969).

*A limiting instruction to the effect that the jury could consider the evidence on the contract issue but not on the assault issue would be ineffective.* The trial will, therefore, be bifurcated. (emphasis added)

■ Rutledge presents three arguments which he asserts constitute grounds for reversible error as a result of the trial court's bifurcation order. First, Rutledge maintains that the trial court erred in holding that Kush's alleged abuse of other A.S.U. football players was not admissible against Kush on the claims of assault and battery, defamation or misrepresentation. Specifically, Rutledge asserts that, while the trial court properly concluded that prior assaultive acts of Kush were not admissible to prove that Kush assaulted Rutledge, *see LaFrentz v. Gallagher,* 105 Ariz. 255, 462 P.2d 804 (1969), the court erred in holding that the prior acts were not admissible on the issue of punitive damages flowing from the alleged assault and battery. Rutledge takes the position that the prior assaultive acts were admissible to establish his claim of malice, a prerequisite to the jury's awarding punitive damages. We disagree, finding the *LaFrentz v. Gallagher* case on point and dispositive. In *LaFrentz,* the plaintiff, a twelve-year-old student, *brought* an action against a physical education teacher, alleging that the teacher had assaulted him during a softball game.

Plaintiff attempted to introduce evidence of defendant's alleged prior assaults of other students to establish malice. The trial court refused to admit the proffered evidence and the Arizona Supreme Court affirmed, holding as follows:

> Prior acts upon third parties, at other times and under different circumstances, would not show or lend any light upon the question as to whether this particular act of Gallagher's was performed for the purpose of discipline, and *would not have any probative value to show malice toward this plaintiff.* (emphasis added)

105 Ariz. at 258, 462 P.2d at 807.

Rutledge's proferred evidence of prior abusive conduct by Kush pertained to *other* players and not to Rutledge himself. Thus, it appears that this evidence would be of little if any probative value in showing malice toward Rutledge. Moreover, none of the proffered evidence pertained to Kush's alleged abuse of other players contemporaneous to his alleged assault of Rutledge. Thus, the evidence would not arguably relate to Kush's state of mind at the time of his alleged assault of Rutledge. *See Furrh v. Rothschild,* 118 Ariz. 251, 575 P.2d 1277 (App.1978); *Forquer v. Pinal County,* 22 Ariz.App. 266, 526 P.2d 1064 (App.1974). Thus, we conclude that the trial court did not err in precluding Rutledge's proffered evidence of prior assaultive conduct pertaining to the issue of malice on Rutledge's punitive damages claim on the assault and battery claim.

■ Rutledge next argues that the trial court should have given a limiting instruction, rather than bifurcating the trial. Rutledge maintains that bifurcation led to distortion, disjunction and confusion of the evidence constituting reversible error.

The trial court is given broad discretion under Rule 42(b), Arizona Rules of Civil Procedure, in determining whether claims should be tried separately so as to avoid prejudice. *Morley v. Superior Court,* 131 Ariz. 85, 638 P.2d 1331 (1981); *Anderson Aviation Sales Co., Inc. v. Perez,* 19 Ariz.

App. 422, 508 P.2d 87 (1973). The trial court specifically found that a limiting instruction would be ineffective. In view of the fact that the proffered evidence consisted of allegations of assaultive actions on other players, we do not find an abuse of discretion. Clearly the trial court did not err in its conclusion that the jury would have difficulty divorcing the alleged prior assaultive acts from the issue of whether Kush assaulted Rutledge in the case at bar.

■ Rutledge's last argument pertaining to bifurcation is that, by allowing the same jury to sit in the second phase of the trial, after it had rendered a verdict against him in the first phase, he was denied the right to a fair trial before an impartial jury during phase two of the trial. Contrary to Rutledge's assertions, there is no constitutional problem in separately trying different claims to the same jury:

> There is no constitutional problem in ordering separate trials of issues, with the same jury to sit in each trial. It seems to be accepted that the better and preferred practice is to use the same jury for all issues, even though it may hear the issues at different times.
>
> The issue can thus be narrowed to whether the admittedly preferred procedure is constitutionally required. It has been held, on sound ground, that the Seventh Amendment is not violated by the separate submission of the issues to a single jury.

Vol. # 9, Wright and Miller, *Federal Practice and Procedure* § 2391 at 302 (1971); *see also, Woods v. Harker*, 22 Ariz.App. 83, 523 P.2d 1320 (1974); *Martin v. Bell Helicopter Co.*, 85 F.R.D. 654 (D.Colo.1980). Thus, Rutledge's argument on this point fails.

## EVIDENTIARY RULINGS

### A. *Videotaping of Rick Lynch's Testimony*

■ Rutledge asserts that the trial court abused its discretion in ordering that the testimony of witness Rick Lynch be videotaped, rather than have him testify in open court.

Rick Lynch was a local businessman who employed several A.S.U. football players during the summer months. Apparently he also did some part-time recruiting of athletes for A.S.U. He was also a director of "The Fallen Angels", a foundation that provided scholarship money for A.S.U. students. Kush asserted that Lynch had called several football players and their families, informing them that he had video tapes and photographs of Kush punching Rutledge in an attempt to coerce the players into stating that they saw the punch. Moreover, Kush maintained that Lynch had conspired with assistant coach Bob Owens and others in an attempt to have Kush fired as head coach.

Rutledge asserted at trial that Lynch was merely attempting to help several players who were afraid to tell the truth concerning what they had seen. Rutledge maintained that the players feared repercussions from Kush and others should they admit that they saw the punch. Thus, Rutledge took the position that Lynch did no more than advise the players to tell the truth and provided channels for them to do so.

The trial court ordered videotaping of Rick Lynch's testimony based upon Lynch's conduct during pretrial depositions, as well as the comments of counsel. The trial court's concerns can best be illustrated through the following in-chambers excerpts from discussions concerning Lynch's testifying:

> MR. PLATT [Counsel for Kush]: ... Let me say one thing in conclusion and shut up. I want you to be aware of something, that Mr. Hing will acknowledge to you. Rick Lynch is an absolute loaded gun. And I would encourage you, no matter what you do about him, to talk to Judge Cates before he goes on the stand. My guess is—and I say it only as a guess—what restrictions are placed on him, no matter what admonitions are given to him, he'll mistry this case as sure as the day is long.

I want you to know that's my belief, because I for sure will be extremely narrow and extremely careful in my questioning of him. Because he will say anything at any time, regardless of the question asked. He's going to be a terrible problem. And I don't want to mistry it myself. I will be very narrow and I'll be very direct, and I will lead him as much as I can.

MR. HING [Counsel for Rutledge]: Well, I'm going to ask permission of the Court to—permission to lead him for the same reason.

THE COURT: Let me ask you, sincerely, is it worth it?

MR. HING: Well, Your Honor, they've raised this issue—they've raised—you know, the Rick Lynch business was fairly, you know, background music until today. When they raised the issue head-on with Gary Bouck, and I've got to rebut it—

\* \* \* \* \* \*

MR. GALLAGHER [Counsel for Board of Regents]: Odds are 80–20 we mistry it with him on, no matter what anybody thinks.

THE COURT: He [Lynch] was in here for awhile, and I understand the problem. And I know the problem. Mr. Hing, is he not going to take any admonitions? Is he not going to obey my orders?

MR. HING: Well, you know, he's going to be difficult. Ordinarily I would say that he would, but Rick Lynch is a dying man, okay? He knows he's dying, and in that position—

THE COURT: Does he know that? If he does, and the case will be mistried, that will only hurt the plaintiff.

MR. HING: Well, sure. But at this point I don't think Rick Lynch has any particular—I don't think he—you know, that doesn't disturb him very much.

THE COURT: I'm not going to allow you to call him.

MR. PLATT: I don't think you can deny Mr. Hing.

MR. HING: You're not going to allow me to call him?

THE COURT: No, I'm not going to mistry this case because somebody won't obey the Court's orders. That kind of evidence—that kind of testimony—well, I'll do what I have to if anybody says they won't obey the Court's orders. I won't allow you to call him. Call him through deposition or take him by video tape. I'll let you do something like that.

I'm not putting the powder keg on the stand.

MR. HING: I didn't say he won't obey your orders. I'm just saying that he'll be very difficult because of the condition.

THE COURT: You say he's dying? He doesn't care? You know, I'm not going to do anything to some dying man, you know, and I can't control him if his hatred is that great.

MR. HING: Well—

THE COURT: If his hatred is that great, and I have observed, to me, frankly, the hatred engendered by this case—it's truly awe inspiring. It goes beyond anything I've ever experienced for anybody I can see. I believe Mr. Platt, and I believe you. We have got a powder keg.

How about a deposition or how about a video tape?

\* \* \* \* \* \*

THE COURT: Is he irrational because of his illness?

MR. PLATT: I don't know. I'm not a doctor. It isn't just Frank Kush. I mean, he's got a vehemence for a whole list of people that is unbelievable. And at any given moment, during his deposition, when I was taking his deposition in this case, I could do nothing except just sit and listen to him talk.

When he got done I would ask him the next question and sometimes he'd answer and sometimes not.

\* \* \* \* \* \*

MR. HERZOG [Counsel for Rutledge]: How Rick Lynch can sometimes be controlled—Rick Lynch plays to the public. I don't know if you can exclude people

during the trial or not, but if Rick Lynch thinks his testimony is going to be closed, and never hits the newspapers, he'll play it a lot straighter. I don't know if you can do that.

THE COURT: I can't do that. You'd have no—you just have—

MR. HING: That's true, if you had a closed hearing, that—

MR. PLATT: Why don't you do it by video tape? The nice thing about video tape—

THE COURT: Please do it by video tape.

MR. PLATT: At that point we can do it. He's a live [sic]—I'll stipulate to the fact you can say Rick Lynch is ill and he really was not able to be here. As a result of that we have taken it by video tape.

THE COURT: I really wish you would do it that way. I may order you to do it that way. Let's do something rational to save this trial. I know I get into these colloquies, like I was saying sometimes, and if you—you're making a record, and I don't know what your fall-back position is.

You get an issue and a rational decision out of me, or one, let's say, that's less than optimum, but why don't we do it by video tape, and that way when he rambles and puts the stuff in, we can edit it and put on those things that are admissible, and take out those things that are not.

I'll tell you this, that I've talked to Judge Cates, and Judge Cates told me he was absolutely unable to control him. There wasn't anything that he could do, as I remember my conversation. I hope I'm not stating it too strongly, but Judge Cates did tell me that he was not able to control the testimony.

MR. HING: You know, that's certainly—if you're not going to permit me to call him, that's the next fall-back.

THE COURT: All right. That is an unusual case like this. That's the fall-back. I just—you can have the time you need to depose him. I won't have a mistrial over a man who's not rational.

The trial court has great discretion in controlling the conduct of a trial. *Hales v. Pittman*, 118 Ariz. 305, 576 P.2d 493 (1978). Rutledge was permitted to "present his case" by presenting the testimony of Rick Lynch. Given the comments of counsel, the trial court was faced with the likely prospect of having a long and grueling trial, which had already gone five weeks, mistried if Lynch were to testify in open court. Given the circumstances before the trial court, we find no abuse of discretion in ordering that Rick Lynch's testimony be presented by way of video-tape.[4]

■ Rutledge further asserts that he was denied a fair trial because the poor quality of the videotape diminished the impact of Lynch's testimony. The record indicates that the first forty-five minutes of the videotape was played to the jury on the morning of March 11, 1981. Following the noon recess, one of the jurors informed the court that a majority of the jury members could not hear various portions of Rick Lynch's testimony due to the poor audio quality of the tape. After conferring with counsel, the court decided to replay the videotape from the beginning, with the aid of a booster microphone. Prior to replaying the videotape, the court instructed the jury as follows:

What we are going to do, ladies and gentlemen of the jury, is this. We will play the tape from the beginning, we have kind of a booster microphone, so we don't have to turn the volume up too loud on the television set, and it will be less garbled that way. If it is not this evidence is like all others, you have to hear it, the weight to give it is entirely up to you, but you must hear it.

4. Rick Lynch is now deceased and in any new trial the taped deposition of Rick Lynch would probably be used.

If you don't hear it, if even one of you don't hear it, hold up your hand. If I don't see you, interrupt us and tell us right away that you don't hear it. Mr. Herzog has a transcript and he will simply reread the portion that you missed, so that we are sure everybody hears all of it.

During presentation of Lynch's videotape testimony, members of the jury indicated that they could not adequately hear the testimony on seven occasions. In each instance, the tape was stopped and Rutledge's counsel read those portions of the tape that were inaudible to some members of the jury. Additionally, Rutledge's counsel requested, and was granted, permission to read to the jury a portion of Lynch's redirect examination testimony.

We find that the trial court took sufficient steps to ensure that the testimony was heard by all members of the jury. Consequently, we find a lack of prejudice sufficient to warrant a reversal on this issue.

### B. *Alleged Hearsay Testimony*

 Rutledge asserts that hearsay testimony from nine witnesses was improperly admitted by the trial court. *See* Rule 801, Arizona Rules of Evidence. Most of the testimony which Rutledge claims was hearsay arises from a coaches' meeting held by Kush on October 3, 1979. Rutledge took the position that Kush, in discussing the Rutledge incident, told his assistant coaches that "they had to stick together, even if it meant lying or perjuring themselves, or else they would all be fired." Thus, Rutledge maintained that the meeting corroborated Rutledge's allegation that Kush had punched Rutledge. Kush took the position that he was not discussing Rutledge at the meeting but that he was discussing Rick Lynch and Lynch's adverse effect on the team due primarily to his telephoning and speaking to players and their families in attempts to coerce players into stating that they had seen Kush punch Rutledge. Consequently, most of the testimony that Rutledge claims constituted hearsay pertains

to statements to the effect that Lynch was telephoning players and to what was purportedly said by Lynch to the players.

The first witness from whom Rutledge claims inadmissible hearsay was elicited is Frank Kush. Actually, in regard to Kush, Rutledge maintains that Kush "volunteered" the hearsay statement that Lynch was bothering the parents of the players and attempting to get the players to make statements about the Rutledge incident in response to a question by Rutledge's counsel. The record reveals the following:

Q Okay. Can you tell me what happened at that meeting, what was said?

A Well, besides talking about a practice schedule, and probably player personnel, that we talked about all the time, we were talking about Rick Lynch.

Q Did you also discuss the Rutledge case?

A No, sir.

Q You never discussed the Rutledge case at any time during that meeting?

A I don't believe so.

Q What did you say to the coaches at that time?

A Well, if I remember that, Rick Lynch was creating problems, he was bothering the players, the players were concerned about it. He was bothering some of the parents, he was calling them up, and he was attempting to get youngsters to make statements about the Rutledge incident.

I told our coaches that we can't be concerned about him. We must stick together on this and not listen to his various statements that he has been making.

Q Anything else?

A That's basically—and the NCAA violations that he may have been involved in.

Q Did you say anything else at that time?

A I think that was basically what we talked about.

Kush's statement was in direct response to a question asked by Rutledge's counsel. Kush was asked what he had told his coaches and he responded. Moreover, if Rutledge's counsel felt that the answer was nonresponsive, it was incumbent upon him to object and request that the court strike the answer and admonish the jury. Clearly, this was not requested, nor was any other objection made to Kush's response. Having failed to object in the trial court, Rutledge is precluded from raising this issue on appeal. *Shell Oil Company v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (App.1978).

■ Rutledge also claims that hearsay testimony was elicited from Bob Owens over Rutledge's objection. Bob Owens was an assistant coach under Kush. Following Kush's dismissal, Owens was appointed as interim head coach for the remainder of the 1979 football season. During direct examination by Rutledge's attorney, Owens testified that Kush had told him and other assistant coaches at the October 3, 1979 meeting that "we should all stick together, even if it meant lying or perjuring ourselves, or else we were all going to get fired." Additionally, he testified that he had drawn the inference that Kush was referring to Rutledge.

During cross-examination, Owens testified that Rick Lynch had telephoned him in September, 1979 and told him that Lynch had videotapes and photographs of Kush hitting Rutledge. Additionally, Owens testified that Lynch told him that "he was out to get Coach Kush." Finally, Owens was asked if he was told by two reporters that Kush was to be fired, prior to Kush's suspension. Owens responded affirmatively. Rutledge maintains that the above constitutes hearsay, which was improperly admitted by the trial court warranting reversal.

Kush takes the position that the challenged testimony is not hearsay because it was not offered to prove the truth of the statements but rather to show their effect upon Owens' frame of mind. Specifically, Kush asserts that the evidence was offered to show that "Owens had been motivated by his own career objectives to conspire with Lynch for the purpose of securing Kush's dismissal and advancing his own career."

We find the following language from a recent Arizona Supreme Court opinion to be dispositive:

It is a well recognized principle that "[w]henever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned." 6 J. Wigmore, *Wigmore on Evidence* § 1789, at 314 (Chadbourn rev. 1976). Thus, words offered as evidence of an utterance which caused a state of mind in the listener are not within the proscription of Ariz.R.Evid. 802, since they are not offered for a hearsay purpose.

The value of the evidence in such cases does not depend on the truth of the words, but is relevant to prove the motive or the reasonableness of conduct of the person receiving the communication.

1 M. Udall & J. Livermore, *supra*, § 122 at 238.[5]

*Public Service Co. v. Bleak*, 134 Ariz. 311, 320–21, 656 P.2d 600, 609–10 (1982). (emphasis in original) (citations omitted).

Clearly the aforementioned testimony was not offered to prove the truth of the matters asserted. The testimony was offered in an attempt to lead the jury to infer that Owens was influenced by the communications to advance his own career objectives at the expense of Kush. The jury was so instructed during redirect examination of Owens:

THE COURT: Yes. Let me make that clear, ladies and gentlemen.

Again, you've heard me remark from time to time that matters are admissible that go to the state of mind when there's

5. 1 M. Udall & J. Livermore, *Arizona Practice: Law of Evidence* § 122 at 238 (2d ed.1982).

been a hearsay objection. That means that you can consider what was said to this witness for the purpose of evaluating what he did and why he might have done or what he did and what he said and why he might have said it, or what this witness might have said or done something.

It cannot be considered to prove that things were said to him that in fact were true, because they're hearsay. Now, that's a fine—it can be a fine distinction, especially if you're not schooled to it.

So, I'll repeat it from time to time, but remember this evidence is what someone else said to him and it's only offered to prove what Mr. Owens thought.

Rutledge is correct in asserting that Owens' testimony was not within the hearsay *exception* for showing the *declarant's* state of mind. *See* Rule 803(3), Arizona Rules of Evidence. Rule 803(3) is applicable *only if* evidence is offered to prove the *declarant's* state of mind. See 1 M. Udall & J. Livermore, *supra*, § 128. The testimony was admitted for the effect, if any, the statements might have had on Owens' state of mind and subsequent conduct. Whether the statements were true or not was irrelevant.

Rutledge further asserts that Owens' state of mind was not relevant to any issue which was tried in the lawsuit. It is true that Owens' state of mind was collateral to the issues being tried. In fact, all of Owens' testimony pertains to collateral issues. The issue being tried at the time the afore-mentioned testimony came in was whether or not Kush assaulted Rutledge. Owens did not testify that he saw the alleged assault; rather, his testimony was related to issues entirely collateral to Rutledge's claim. Even if we were to find that the trial court improperly admitted the testimony, reversal would not be warranted because of the collateral nature of the testimony. *See* Rule 61, Arizona Rules of Civil Procedure; Rule 103(a), Arizona Rules of Evidence; *State ex rel. LaSota v. Arizona Licensed Beverage Ass'n*, 128 Ariz. 515, 627 P.2d 666 (1981).

■ Rutledge claims that hearsay testimony was also elicited from witnesses Steve Chambers, Fred Miller, Gary Bouck, Steve Bratkowski, Robert Tolbert, Harry J. Cavanagh and John Mistler. With the exceptions of Miller and Bouck, in each instance the challenged testimony was properly admitted as going to the effect of the communications upon Kush. *See Public Service Co. v. Bleak, supra.* The witnesses testified that they had informed Kush, prior to the October 3, 1979 meeting, that Lynch had been calling various players and their families. Additionally, Mistler testified that he told Kush that Owens was Lynch's "inside man". The statements were not admitted to prove the truth of matters asserted but to substantiate Kush's claim that he was discussing Lynch's disruptive activities at the meeting. While we realize that what transpired at the October 3, 1979 meeting is collateral to the issues being tried, all parties insisted on extensively litigating what was said at the meeting and the facts surrounding the meeting. Thus, we conclude that the trial court did not err in overruling Rutledge's hearsay objections.

■ Fred Miller, athletic director at A.S.U. at the time of Kush's dismissal, was called by Rutledge to testify. During direct examination, Miller testified that, after being informed of Rutledge's claim against Kush and A.S.U., he discussed the matter with Kush. Miller stated that Kush told him that Rutledge's charge was "ridiculous", that he never struck Rutledge, and that he was nowhere near Rutledge when he came off the field after punting. Miller further testified that he eventually recommended to then A.S.U. president John Schwada that Kush be suspended pending a hearing on the allegations. Miller stated that his recommendation was based primarily upon discussions with football players Gary Bouck, Brian Caldwell and Steve Chambers, as well as Eugene Felker, former director of the Sun Angel Foundation and a spectator at the Washington game. Miller testified that all three players told him that they saw Kush punch Rutledge,

and that Felker told him that he had seen Kush "swing" at Rutledge, although he did not actually see the blow land.

The parties argued at length in chambers concerning the relevancy of Miller's state of mind at the time he recommended that Kush be suspended.

As the record discloses, the parties litigated the collateral issue of why Kush was suspended or fired. Rutledge opened the door during direct examination, thereby putting in issue Miller's reasons for recommending that Kush be suspended. Consequently, the trial court properly ruled that evidence pertaining to Miller's state of mind up to the time Kush was suspended was admissible. *See* Rule 803(3), Arizona Rules of Evidence.

The challenged evidence in regard to Miller's testimony consists of a memorandum dated September 24, 1979 from assistant coach Gary Horton to Miller, in which Horton indicates that he has "informally" talked to many of the A.S.U. football players concerning the "Kevin Rutledge situation." The memorandum was accompanied by attached statements signed by the players.[6] Rutledge asserts that defense counsel's questioning of Miller concerning these statements was improper since *Horton's* state of mind was not relevant to an issue in the lawsuit. However, the memorandum and statements were relevant to *Miller's* state of mind at the time he recommended that Kush be suspended. Consequently, the trial court did not err in overruling Rutledge's hearsay objection on this issue.

Rutledge also challenges Kush's cross-examination of Miller pertaining to statements made to Miller by Bill Cole, a consultant to the A.S.U. football team. Miller testified that Cole told him that two friends of Cole's were in attendance at the Washington game and had witnessed the "incident". Cole told Miller that his friend told Cole that they saw Kush grab and shake Rutledge's facemask during the Washington game but did not see Kush punch

Rutledge. Unquestionably this constitutes hearsay; however, once again it was properly admitted pursuant to Rule 803(3), Arizona Rules of Evidence. Miller's conversation with Cole transpired *prior* to the time that Miller recommended that Kush be suspended, therefore it was admissible as going to Miller's state of mind. Moreover, both of Bill Cole's friends, Duane Locknane and John Oordt, testified at trial. Their testimony was entirely consistent with that elicited during Kush's cross-examination of Miller. Consequently, we find that even if the trial court had erred in admitting the testimony, any error would be harmless since no substantial rights of Rutledge's could possibly have been prejudiced. *See* Rule 61, Arizona Rules of Civil Procedure; Rule 103(a), Arizona Rules of Evidence; *State ex rel. LaSota v. Arizona Licensed Beverage Association, supra.*

■■■ Rutledge maintains that hearsay testimony was also elicited from A.S.U. football player Gary Bouck. Bouck testified that he telephoned Rick Lynch and that, at some time after the conversation, Lynch informed Bouck that he had recorded their telephone conversation. Bouck stated that he and Lynch had several subsequent telephone conversations and on each occasion, Lynch would inform Bouck beforehand that the conversation would be recorded and that Bouck agreed to the recordings. Bouck was then asked if Lynch had told him to whom the recorded tapes were given. Bouck testified that he could not remember if Lynch ever told him who was given the tapes, "but somewhere down the line it's been told to me that the tapes were given to Mr. Hing [Rutledge's counsel]."

We agree with Rutledge's assertion that the above constitutes hearsay, not within an exception to the hearsay rule. However, the issue of whether Lynch recorded conversations between himself and Gary Bouck and to whom the tapes were given was entirely collateral to the claims being

---

**6.** The record on appeal includes the memorandum from Gary Horton to Fred Miller, in which Horton states that "[e]ach of the players I've

talked to has signed the attached statement." However, the record does not include the referred-to statement.

litigated. Moreover, Rutledge elicited the same testimony from Rick Lynch concerning the recording of phone conversations. As concerns Bouck's testimony that the tapes were given to Rutledge's counsel, Lynch testified as follows:

Q [Rutledge's counsel]: Now, Mr. Lynch, there was some intimation the other day in cross-examination of Gary Bouck that you had delivered a tape to my office for us to listen to; do you recall doing that?

A Yes, I do, sir.

Q And do you recall what tape that was?

A I believe, it was the tape of Gary Bouck saying Rick, I saw him hit him.

Thus, Lynch testified that the tape was at one time in the possession of Rutledge's counsel. During cross-examination Lynch was asked where the tapes were currently located:

Q [Kush's counsel]: Mr. Lynch, where are those tapes?

A Mr. Platt, I don't know.

Q What was done with the tape of Gary Bouck that was played to Gene Felker and also played to Mr. Miller, and—what did you ever do with that?

A All of that stuff was turned over to the attorney, Mr. Richard Himelrick, who was—when Frank Kush filed his lawsuit against me, was the attorney of record in—defending me, all—everything there was turned over to Mr. Himelrick for my second deposition in, I believe, it wasn't that—in that November 7th deposition. I had hired another attorney by the name of Mr. Tom Henze—

Q Have you seen the tapes—

A No.

Q —since you turned them over?

A I beg your pardon?

Q Have you seen the tapes since you turned them over to Mr. Himelrick?

A No, sir. It is my belief now they were in the possession of Mr. Fred Creasy.

Q That is your belief?

A That is my belief now. You asked me if I knew where they were, and I think that's where they are.

Lynch's testimony is entirely consistent with that of Bouck. Lynch explained that, although the tapes were once in the possession of Rutledge's attorney, they were subsequently given to Lynch's attorney and that it was his belief that they were currently in the possession of another attorney.

Clearly Rutledge was not prejudiced by the admission of hearsay testimony elicited from Gary Bouck. *See* Rule 61, Arizona Rules of Civil Procedure; Rule 103(a), Arizona Rules of Evidence; *State ex rel. La-Sota v. Arizona Licensed Beverage Ass'n, supra.* Consequently, we find that any error was harmless.

### C. *Closing Argument*

■ Rutledge asserts that, during closing argument in phase one of the trial, Kush's attorney argued extensively concerning the alleged hearsay testimony discussed above without any regard for the extremely limited purpose for which the testimony had been admitted.

The record reflects that Rutledge objected only to counsel's discussion regarding the tape recordings Rick Lynch had made of his conversations with various A.S.U. football players. Rutledge objected on the basis that there was evidence in the record concerning only the first Gary Bouck tape. The trial court instructed counsel to limit his comments to the one Bouck tape and counsel complied. No further objections were urged by Rutledge during or following closing arguments, nor did Rutledge move for a mistrial based upon improper conduct of counsel during closing argument. In his motion for new trial, Rutledge's allegations of misconduct during closing argument were limited to counsel's use of enlarged cards containing portions of trial transcript and counsel's reference to Rutledge's father. Rutledge did not raise the misconduct allegations he now urges before this court. We conclude that Rutledge has failed to preserve this issue

for appeal. *See Grant v. Arizona Public Service Co.*, 133 Ariz. 434, 652 P.2d 507 (1982).

## STIPULATION ON ASSAULT AND BATTERY

Rutledge asserts that the trial court abused its discretion by ruling that Rutledge's counsel had stipulated to a waiver of his claim for battery arising from the slapping of his helmet and the pulling of his facemask by Kush. The stipulation at issue arose during direct examination of Rutledge. Counsel was questioning Rutledge concerning his recollection of specific occasions in which Kush had either grabbed his facemask or slapped his helmet. Rutledge stated that he could not recall specific instances or dates. The following exchanges then transpired:

Q [BY MR. HING]: Now, can you tell me why you don't recall specific occasions when he might have grabbed you by the face mask or slapped you on the helmet?

MR. PLATT: Objection to the form of the question. How can he possibly testify as to what he doesn't remember.

THE COURT: Overruled.

Q [BY MR. HING]: I am asking why he doesn't remember.

You can answer.

A Basically it's because at that point in time, or any time while I was attending ASU, that wasn't something unusual, that was something that occurred quite often, you know, whether it was to me or not *it occurred among my fellow players all the time*, you know, at some point. At that time, you know, I basically would not have thought anything of it.

MR. PLATT: Could we approach the bench, Your Honor?

THE COURT: Yes.

(Whereupon, an at-the-bench discussion was held out of the hearing of the jury.)

THE COURT: Go ahead.

MR. PLATT: If it please the Court, you know that is inexcusable. There was no answer that could have conceivably come to that question except just exactly what I knew was coming, and everybody also knew what was coming. The reason he didn't remember, because it wasn't unusual, it happened to anybody. We have very clear word that we are not to talk about what did or did not happen to other players.

THE COURT: I thought there was nothing wrong with slapping helmets or pulling face masks, that was part of it.

MR. PLATT: Then I assume we will have an instruction at the end of the case that *grabbing face masks and pulling helmets is not an assault.*

THE COURT: *That's not your claim.*

MR. HING: *That's not my claim.*

MR. PLATT: That's permissible conduct?

THE COURT: Sure. That's not the point?

MR. HING: Absolutely not. (emphasis added)

A stipulation is an agreement, admission or concession made in a judicial proceeding by the parties or their attorneys, in respect to some matter incident to the proceedings, ordinarily for the purpose of avoiding delay, trouble and expense. *Harsh Building Company v. Bialac*, 22 Ariz.App. 591, 529 P.2d 1185 (1975). The parties are bound by their stipulations, unless relieved therefrom by the trial court. *Pulliam v. Pulliam*, 139 Ariz. 343, 678 P.2d 528 (App.1984); *Harsh Building Company v. Bialac, supra.*

Despite counsel's unequivocal statement "[t]hat's not my claim" in response to the court's inquiry as to whether Rutledge's assault claim encompassed the grabbing of his facemask and slapping of his helmet, Rutledge maintains that a waiver was not intended. Rather, asserts Rutledge, counsel was merely indicating that he had elicited Rutledge's testimony to show why Rutledge's recollection of the specific instances in which he had been struck by Kush were hazy, and not to show Kush's abuse of other football players. We find this contention untenable; the

record clearly reflects a stipulation of waiver.

 We further conclude that the trial court did not abuse its discretion in refusing to relieve Rutledge of the effect of his stipulation. The trial court, in the exercise of its sound discretion, may set aside a stipulation entered into through inadvertence, excusable neglect, fraud, mistake of fact or law, where the facts stipulated have changed or there has been a change in the underlying conditions that could not have been anticipated, or where special circumstances exist rendering it unjust to enforce the stipulation. *Harsh Building Company v. Bialac, supra.*

Rutledge asserts that the stipulation was the result of a "misunderstanding". It is difficult to believe that counsel did not fully understand and appreciate the effect of his statement "[t]hat's not my claim" considering the context in which the statement was made. The trial court had previously ruled that Kush's treatment of other players was not admissible during phase one of the trial. Consequently, counsel had to be aware of the fact that it was improper to elicit testimony of prior assaultive conduct on other players, even if it were elicited solely for the purpose of explaining Rutledge's lack of specific recollection of facemask grabbing and helmet slapping. By stating "[t]hat's not my claim", counsel clearly indicated that he did not consider the grabbing of facemasks and slapping of helmets to be a viable claim.

Subsequent to counsel's stipulation, several witnesses testified to facemask grabbing and helmet slapping. This testimony would not have been admissible but for counsel's stipulation that he was not pursuing a claim for facemask grabbing or helmet slapping. The trial court did not abuse its discretion in refusing to relieve Rutledge of the effect of his counsel's stipulation.

## JURY INSTRUCTIONS

### A. *Qualified Privilege*

Rutledge asserts that the trial court improperly instructed the jury concerning Kush's and Maskill's qualified privilege to interfere with Rutledge's contract (scholarship) with A.S.U. The trial court instructed the jury as follows:

> In certain situations, an employee may have a qualified privilege to cause a breach of his employer's contract with a third person. In order to assert such a privilege, the employee must prove that his acts were taken in good faith belief that they were for the interests of his employer, and that he did not employ wrongful means to cause a breach of his employer's contract.

Rutledge maintains that the instruction is an incorrect statement of the law in Arizona in that it does not address "the quality of the interest of the employer which is being served." Specifically, Rutledge asserts that the instruction must specify that the employer's interests being served must be "lawful". Rutledge submitted a proposed instruction which specified that the employee's act must be for the "best lawful interest of his employer." The trial court deleted the words "best lawful" and instructed the jury as noted above.

 Rutledge relies on the case of *Ong Hing v. Arizona Harness Raceway, Inc.,* 10 Ariz.App. 380, 459 P.2d 107 (1969), to support his assertion. In *Ong Hing,* we addressed the issue of personal liability of corporate directors for inducing a breach of the corporation's contract with a third party:

> ... [T]he acts of such directors should be privileged provided that the acts complained of were in good faith and the director believed that his acts were for the *best lawful* interests of the corporation. (emphasis added)

10 Ariz.App. at 388, 459 P.2d at 115. Thus, the instruction submitted by Rutledge was a correct statement of the law regarding qualified privilege in Arizona. However, a party is not entitled to its own instructions simply because it is a correct statement of the law. *Hallmark v. Allied Products*

*Corp.*, 132 Ariz. 434, 646 P.2d 319 (App. 1982); *Sequoia Mfg. Co. v. Halec Const. Co.*, 117 Ariz. 11, 570 P.2d 782 (App.1977). It is not error to refuse to give requested instructions where the concepts contained therein are adequately conveyed through given instructions. *Hallmark v. Allied Products, supra.* We conclude that instructions given adequately set forth the qualified privilege defense.

▮ The jury was advised that an employee may not employ "wrongful means" to cause the breach of his employer's contract. Another instruction provided the jury with guidelines for determining whether the employee's conduct was wrongful and read as follows:

In determining whether an actor's conduct in intentionally interfering with the contract or a business expectancy of another is wrongful you may consider the following factors:

(a) The *nature of the actor's conduct*

(b) The actor's motive. In this respect a good faith belief that the acts were in the interests of the employer means that the employee had an intent to benefit the employer by his actions and did not act purely from the pursuit of personal goals or solely for his personal gain

(c) The interests of the other with which the actor's conduct interferes

(d) The *interests sought to be advanced* by the actor

(e) The *social interests* in protecting the freedom of action of the actor and contractual interests of the other

(f) The proximity or remoteness of the actor's conduct to the interference

(g) The relations between the parties. (emphasis added)

Clearly, the instructions given by the trial court were sufficiently broad to allow counsel to argue that the interests of the employer to be advanced had to be "lawful". *See Porterie v. Peters,* 111 Ariz. 452, 532 P.2d 514 (1975); *Hallmark v. Allied Products, supra; Sequois Mfg., supra.*

B. *Limiting Instruction Pertaining to Prior Bad Acts*

▮ Rutledge argues that the trial court erred by instructing the jury during phase two of the trial as follows:

Evidence of the defendant Kush's treatment of other players who *allegedly left the team as a result of such treatment* is admissible against the defendant Kush on the issue of whether he knew or should have known that his treatment of Kevin Rutledge would cause Kevin Rutledge to leave the team. It is also admissible against the defendant Schwada on the issue of whether he knew or should have known that such treatment would cause players to leave the team. It is not admissible against any other defendant or for any other purpose.

Evidence of the defendant Kush's treatment of any player, *whether he left the team or not,* is admissible on the claim against defendant Schwada for negligent supervision. It is not admissible against any other defendant or for any other purpose. (emphasis added)

Rutledge takes the position that evidence of all of Kush's alleged abuses of football players shows that Kush's actions in forcing Rutledge to forego his scholarship at A.S.U. were intentional. We find Rutledge's position on this issue to be confusing. Clearly, if players were mistreated by Kush but did not leave the team, such conduct would not tend to prove that Kush *intended* to coerce Rutledge into leaving the team. In fact, the opposite is true. If Kush did mistreat other players and they did not leave the team, the inference is that Kush's alleged mistreatment of Rutledge was not intended to coerce him into leaving but to increase his performance. In those instances in which players did in fact leave the team as a result of Kush's alleged mistreatment, relevancy is established. This is precisely how the jury was instructed by the trial court. We find no error.

Rutledge's assertion that Kush's alleged mistreatment of other players was admissible during phase two on the issue of punitive damages is moot in light of the fact

that the jury failed to find that Rutledge was entitled to an award of actual damages. *LaFrentz v. Gallagher, supra.*

## DISMISSAL OF 42 U.S.C. § 1985 CLAIM

Rutledge's first amended complaint included a claim under 42 U.S.C. § 1985(2), alleging intimidation of witnesses. Prior to trial, the trial court granted defendants' motion to dismiss this claim. The motion to dismiss was purportedly granted on two separate grounds. The first was res judicata, in that a "substantially similar" complaint had been dismissed by the United States District Court in November, 1979. The second ground for granting dismissal of the claim was that the complaint failed to state a cause of action under 42 U.S.C. § 1985(2).

Rutledge takes the position that once the trial court determined that his § 1985(2) claim was barred by the doctrine of res judicata, it had no further authority to consider the merits of the claim and that any discussion of the merits contained in the court's minute entry is merely dicta.

■ The reasons for orders of dismissal are surplusage and only the correctness of the judgment will be considered on appeal. *Fendler v. Phoenix Newspapers Inc.,* 130 Ariz. 475, 636 P.2d 1257 (App.1981). Thus, we will affirm the trial court's granting of the motion to dismiss if it was correctly granted, although for the wrong reasons. *Espil Sheep Company, Inc. v. Black Bill & Doney Parks Water Users Association,* 16 Ariz.App. 201, 492 P.2d 450 (1972).

We find that Rutledge's complaint failed to state a cause of action under 42 U.S.C. § 1985(2) and that the claim was properly dismissed by the trial court.

In count five of his first amended complaint, Rutledge asserted that the defendants conspired "to deny the plaintiff equal protection of the laws and equal privileges and immunities under the laws" in violation of 42 U.S.C. § 1985(2). Rutledge had asserted a similar claim in federal district court; that claim was dismissed on the ground that he had failed to allege racial or class-based invidious discrimination. *See Rutledge v. Arizona Board of Regents,* 660 F.2d 1345 (9th Cir.1981). In *Rutledge, supra,* the Ninth Circuit Court of Appeals reinstated Rutledge's *federal* § 1985(2) claim, holding that under the first part[7] of § 1985(2) it was not necessary to show a racial or class-based invidiously discriminatory animus.[8] *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The court specifically limited its holding to the first part of § 1985(2), noting that racial or class based discrimination was still a prerequisite under the second part[9] of § 1985(2):

> The same cannot be said with confidence about the second part of section 1985(2) which is concerned with private conspiracies to defeat the course of justice in *state courts* "with the intent to deny to any citizen the equal protection of the laws." *To require a racial or class-based invidiously discriminatory ani-*

7. The first part of § 1985(2) provides:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror;

8. The federal district court action has been stayed pending Rutledge's appeal in this court and any further proceedings in the Arizona Supreme Court.

9. The second part of § 1985(2) provides:

[O]r if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

*mus behind the private conspiracy involving this part of section 1985(2) is entirely proper.* This court has so held. *See Phillips v. Bridge Workers Local 118,* 556 F.2d 939, 940–41 (9th Cir.1977). (emphasis added)

660 F.2d at 1355. The Court's holding and analysis were affirmed by the United States Supreme Court in *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983).

 Based upon our reading of both the Ninth Circuit and United States Supreme Court decisions, we conclude that a person bringing a § 1985(2) action in state court must sufficiently allege some racial or class-based invidiously discriminatory animus to withstand a motion to dismiss. *See Phillips v. International Association of Bridge, Structural and Ornamental Iron Workers, Local 118,* 556 F.2d 939 (9th Cir.1977). Rutledge's first amended complaint fails to set forth a sufficient allegation of racial or class-based invidiously discriminatory animus. Rutledge's allegation that he was "put into a class, with other previous A.S.U. football players, who did not measure up to Kush's standards of performance, and who Kush felt did not deserve a scholarship" is clearly insufficient. The "class" of allegedly mistreated football players is not based upon race. Nor is the "class" based upon political beliefs or associations. Finally, the "class" is not one having common characteristics of an inherent nature, to which the equal protection clause has traditionally afforded special protection. *See Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340 (5th Cir.1981).

### CHANGE OF VENUE

 Prior to trial, Rutledge filed a motion for change of venue pursuant to A.R.S. § 12–406(B)(1), claiming that there existed in Maricopa County so great a prejudice against Rutledge that he could not obtain a fair and impartial trial in Maricopa County. The motion was denied. On appeal, Rutledge asserts that the trial court's denial of his motion constitutes reversible error because he was denied a fair trial.

A.R.S. § 12–406 provides in pertinent part:

A. If either party to a civil action pending in the superior court, after answer has been filed, files an affidavit in the action alleging any of the grounds specified in subsection B and gives five days notice to the opposite party, the venue *may be changed* as provided in § 12–407.

B. Grounds which may be alleged as provided in subsection A for change of venue are:

1. That there exists in the county where the action is pending so great a prejudice against the party requesting a change of venue that he cannot obtain a fair and impartial trial. (emphasis added)

Where a change of venue is sought pursuant to A.R.S. § 12–406, the trial court has sound discretion in deciding the issue and this court will not disturb the trial court's ruling absent an abuse of discretion. *GAC Properties, Inc. v. Farley,* 14 Ariz.App. 156, 481 P.2d 526 (1971).

Rutledge included with his motion for change of venue an affidavit wherein he set forth general and specific instances of hostility experienced in Maricopa County by himself, his family and his attorneys. Additionally, an exhibit entitled "RESULTS OF PUBLIC OPINION POLL CONDUCTED IN MARICOPA COUNTY, ARIZONA, ON ATTITUDES OF MARICOPA COUNTY RESIDENTS TOWARD KEVIN RUTLEDGE AND FRANK KUSH" was submitted along with Rutledge's motion for change of venue. The poll was conducted by telephone during the period of June 28–30, 1980 by a graduate student studying political science and research methodology at Arizona State University. A total of 400 registered voters were randomly polled throughout Maricopa County. Rutledge takes the position that the results of the poll establish that it was impossible for him to obtain a fair and impartial trial in Maricopa County.

The results of the poll indicate that 99% of the persons polled recognized the name

Frank Kush and 78% of those polled recognized the name Kevin Rutledge. Of those recognizing the names, 38% stated that they felt "indifferent" toward Kush and 41% indifferent toward Rutledge. Thus, accepting Rutledge's own statistics, over one-third of the sample expressed no prejudice whatsoever toward either of the parties.

Rule 10.3, Arizona Rules of Criminal Procedure[10], is analogous to the change of venue statute applicable in this case. The Arizona Supreme Court has held that mere knowledge of the facts of a case, standing alone, does not mandate a change of venue in criminal trials. *State v. Tison*, 129 Ariz. 526, 633 P.2d 335 (1981), *rehearing denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). It must be shown that prejudicial publicity had the probable effect of precluding a trial by fair and impartial jurors before a change of venue is required. *Id.* It is not necessary that a juror be totally ignorant of the facts of a case so long as he can lay aside his impressions or opinions and render a verdict based upon the evidence presented in court. *State v. Tison*, 129 Ariz. 546, 633 P.2d 355 (1981), *rehearing denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

Rutledge makes no specific allegations that any of the jurors empaneled were biased or prejudiced. Indeed, the record reflects that the trial court thoroughly screened the jury panel, submitting extensive written voir dire questions and conducting oral voir dire over a period of five days. A change of venue is not required unless the movant can point to objective indications of jurors' prejudice. *State v. Tison, supra; see also, Arizona Water Co. v. City of Yuma*, 7 Ariz.App. 53, 436 P.2d 147 (1968).

**10.** Rule 10.3 provides in pertinent part:
 a. Grounds. In any criminal case, the state or any defendant *shall be entitled* to a change of the place of trial to another county, if a fair and impartial trial cannot be had for any reason other than the interest or prejudice of the trial judge.

We find no abuse of discretion by the trial court in denying Rutledge's motion for change of venue.

## JUDICIAL ADMISSION CONCERNING RENEWAL OF SCHOLARSHIP

■ Rutledge maintains that counsel for the Board of Regents judicially admitted that Rutledge's scholarship was automatically renewable. The alleged admission was made at a hearing on motions for summary judgment on October 29, 1980, approximately three months before trial. Rutledge cites to two statements made by counsel for the Board of Regents at the hearing. Counsel's statements are included in the following excerpts:

MR. HING [Counsel for Rutledge]: In other words, if you read the NCAA regulation, you'll see that all these are one-year contracts; they are, in effect, automatically renewable.

THE COURT: If you cannot fail to renew for a lack of ability, why make it? I don't understand, frankly. If lack of athletic ability is not grounds not to renew, why don't you give them a flat four-year contract?

MR. HING: Because they used to have that, but they changed it. There are certain things that make him ineligible, for example, academically, he hasn't met the requirements.

THE COURT: But that doesn't—that has nothing to do with renewability.

MR. HING: That's one of the grounds for not renewing, if he fails to qualify academically.

THE COURT: What are the others?

MR. HING: Another ground would be if he is guilty of gross personal misconduct or something like that. There are grounds that are set forth—

\* \* \* \* \* \*

 b. Prejudicial Pretrial Publicity. Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial. (emphasis added)

MR. GALLAGHER [Counsel for Board of Regents]: *In real life, you get one every year, unless you really screw up.*

\* \* \* \* \* \*

MR. HING: I think that the Board of Regents—let me inquire—

Do you agree that for all practical purposes these one-year contracts are automatically renewable unless somebody really drastically does something that warrants him being kicked out of school, or something?

\* \* \* \* \* \*

MR. GALLAGHER: We agree that these are technically one-year contracts that are renewed every year, unless one of the provisions in the NCAA manual is met, which gives you grounds not to renew it. But in effect, yes. (emphasis added)

We agree with Rutledge to the extent that the trial court *could* have held the Board of Regents to counsel's admission that scholarships were renewed annually unless one of the provisions of the N.C. A.A. manual were met.[11] However, the trial court has discretion to avoid the consequence of the conclusiveness of an admission. 9 Wigmore, *Evidence* § 2590 (Chadbourn Rev.1981). *See also United States v. Belculfine,* 527 F.2d 941 (1st Cir.1975).

Contrary to Rutledge's assertion, the effect of counsel's admission concerning renewal of scholarships is significantly dif-

ferent from that of counsel's stipulation concerning the grabbing of facemasks and slapping of helmets.

As pointed out by the trial court, Rutledge's counsel made his stipulation *during* trial, resulting in the trial court's ruling that witnesses be permitted to testify concerning the grabbing of facemasks and slapping of helmets by Kush. In fact, the trial judge later stated that if he did not hold Rutledge to counsel's stipulation, he would have to declare a mistrial. Conversely, counsel's admission concerning renewal of Rutledge's scholarship was made *prior* to trial and did not affect the evidence admitted at trial since the trial court denied Rutledge's motion prior to phase two of the trial. Moreover, the Board of Regents implicitly retracted counsel's admission in its December 22, 1980 motion to reconsider the court's refusal to grant summary judgment in its favor on the breach of contract claim. *See Texas Processed Plastics, Inc. v. Gray Enterprises, Inc.,* 592 S.W.2d 412 (Tex.Civ.App.1979) (party entitled to retract admission prior to acceptance of admission by the court or jury); *cf. Thomas v. St. Joseph Hospital,* 618 S.W.2d 791 (Tex.Civ.App.1981) (party entitled to "modify" or "explain" admission to overcome its conclusive effect).

We find no abuse of discretion in the trial court's decision not to hold the Board

---

11. The provisions of the N.C.A.A. manual referred to by counsel are contained in section 3–4–(c) of the N.C.A.A. Constitution which provides:

(c) Financial assistance may not be awarded a prospective student-athlete conditioned on the recipient reporting in satisfactory physical condition. If a student-athlete has been accepted for admission and awarded financial assistance, the institution shall be committed for the term of the original award even though the student-athlete's physical condition prevents him from participating in intercollegiate athletics for any reason.

(1) Institutional aid may not be gradated or canceled during the period of its award on the basis of (i) a student-athlete's ability or his contribution to a team's success, (ii) because of an injury which prevents the recipient

from participating in athletics or (iii) for any other athletic reason.

(2) Aid may be gradated or canceled if the recipient (i) renders himself ineligible for intercollegiate competition; or (ii) fraudulently misrepresents any information on his application, letter-of-intent or tender; or (iii) engages in serious misconduct warranting substantial disciplinary penalty, or (iv) voluntarily withdraws from a sport for his own personal reasons. Any such gradation or cancellation of aid is permissible only if such action is taken for proper cause by the regular disciplinary or scholarship awards authorities of the institution and the student-athlete has had an opportunity for a hearing. Under (iv) above, such gradation or cancellation of aid may not occur prior to the conclusion of that term (semester or quarter).

**556**

of Regents to counsel's admission concerning renewal of scholarships.[12]

## ATTORNEYS' FEES

 Rutledge's final claim is that the trial court erred in awarding the Board of Regents $20,000.00 in attorneys' fees pursuant to A.R.S. § 12–341.01. Rutledge sets forth three grounds upon which he maintains that the award of attorneys' fees was improper.

First, Rutledge asserts that the Board of Regents' claim for attorneys' fees was not timely under Rule 3.6(e)(1) [13], Local Rules of Practice in the Superior Courts for Maricopa County. That rule provides:

A claim for attorneys' fees pursuant to A.R.S. § 12–341.01 shall be made in the pleadings, in the joint pretrial statement, *or by written notice filed and served prior to the trial or other determination on the merits of the cause.*

The Board of Regents filed its claim for attorneys' fees on January 9, 1981, seventeen days prior to commencement of trial. Rutledge, however, points out that numerous motions for summary judgment had been filed, argued and denied. Consequently, asserts Rutledge, the trial court had already made various significant *determinations on the merits* prior to the filing of the Board's claim for attorneys' fees and the filing was therefore untimely.

Apparently Rutledge has overlooked the presence of the word "or" in Rule 3.6(e)(1). The rule clearly provides that a claim for attorneys' fees shall be made prior to trial *or* other determination on the merits. Thus, the Board was at liberty to file its claim either prior to the determination of the various summary judgment motions or prior to trial. The word "or" is defined as "[a] disjunctive particle used to express an *alternative* or *to give a choice* of one

**12.** At trial, Rutledge took the position that his scholarship was automatically renewable for the 1979–80 academic year unless he had failed to comply with the provisions of Section 3–4–(c)(2) of the N.C.A.A. Constitution. *See* footnote 7, *supra.* Consistent with Rutledge's position, the jury was instructed as follows:

> In determining whether or not plaintiff had a contract with the defendant A.S.U. which extended beyond July 1, 1979, you may consider the contract documents admitted into evidence and any testimony concerning the custom and practices of the University in extending scholarship offers and renewing the same. Before custom and practice can be utilized to explain the terms of a contract, you must find both parties were aware of the practice and shared such knowledge because of such wide spread recognition of such custom.
>
> Custom and practice must be shown by "clear and satisfactory" evidence, which is a higher standard of certainty than the burden of proof previously defined.

Rutledge elicited testimony from several witnesses pertaining to A.S.U.'s policy in renewing athletic scholarships. Included in the witnesses questioned on the issue was former Vice President of Student Affairs, Dr. George Hamm. Dr. Hamm testified as follows concerning A.S.U.'s policy of renewing athletic scholarships:

> Q. Now, basically, is it not correct, Doctor Hamm, with respect to nonrenewal, that generally the only reasons for nonrenewing a scholarship would either be one, academic ineligibility; two, serious disciplinary prob-

lems; or three, a voluntary withdrawal from the sport by the athlete?

A. I think that's right.

Q. And then unless you had one of those three situations, you would go ahead and renew an athletic scholarship?

A. It would surely be assumed, yes, that it would be.

Former director of financial aid at A.S.U., Dr. Eugene Marin, was also questioned about A.S.U.'s policy in renewing athletic scholarships and testified as follows:

Q. Now, can you tell me during the period of time that you were in charge of—director of financial aids, what reasons, in your experience, could be used for nonrenewal of a scholarship of this type?

A. The only reasons were those stated by the NCAA regulations, which are academic ineligibility, the athlete's resignation and—well, I'm going to have to look at the notes. Of course, serious disciplinary action.

Q. So basically as far as you knew at that time it had to be, if you refused to renew it, it would have to be based on academic ineligibility, a voluntary withdrawal from the sport or a serious disciplinary problem; is that right?

A. That's correct.

Consequently, although Rutledge was precluded from holding the Board of Regents to counsel's admission, he elicited substantially the same testimony from A.S.U. employees responsible for administering athletic scholarships.

**13.** Rule 3.6(e)(1) was renumbered as Rule 3.7(e)(1) in 1983.

among two or more things." Black's Law Dictionary 1246 (rev. 4th ed. 1968).

We conclude that the Board of Regents' claim was timely filed.

Rutledge's next contention is that the trial court erred in awarding attorneys' fees pursuant to A.R.S. § 12–341.01 because the Board of Regents failed to segregate the amount of fees attributable to the breach of contract claim from those incurred in defending the various tort claims.

In *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982), the Arizona Supreme Court held that attorneys' fees may be awarded pursuant to A.R.S. § 12–341.01(A) based upon facts which show a breach of contract, the breach of which may also constitute a tort. The court further noted:

> The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees under § 12–341.01(A) as long as the cause of action in tort could not exist *but for* the breach of the contract. (emphasis in original)

132 Ariz. at 543, 647 P.2d at 1141.

Phase one of the trial involved the tort claims of assault and battery, misrepresentation and defamation against Kush. Rutledge sought recovery from the Board of Regents under the doctrine of *respondeat superior*. Clearly, Rutledge could have maintained an action for each of these claims even if he did not allege that the Board of Regents had breached its contract (scholarship) with him. The torts allegedly committed by the Board in this situation would not involve a breach of the actual contract; therefore, it would not be an action arising from a contract. *Sparks, supra*.

The claims litigated during phase two of the trial consisted of intentional interference with contractual relations (scholarship) against Kush and Maskill, breach of contract against the Board of Regents, and negligent supervision against George Hamm and John Schwada. Additionally, Rutledge sought recovery from the Board of Regents for Kush's intentional interference with his contractual relations under the doctrine of *respondeat superior*.

Clearly, both claims asserted against the Board of Regents in phase two would not exist *but for* the alleged breach of contract. Rutledge maintained that, by intentionally interfering with his contractual relationship with A.S.U., Kush and Maskill forced him to leave A.S.U., thereby resulting in a breach of contract.

Thus, it does not appear that a portion of the Board's attorneys' fees were incurred in defending claims which sound strictly in tort (phase one). However, this does not require us to reduce or vacate the award in this case. *See Sparks, supra*. In its motion for an award of attorneys' fees, the Board of Regents states that it had incurred in excess of $100,000.00 in attorneys' fees in defending the lawsuit. The motion was accompanied by an affidavit of counsel avowing the same. However, the Board requested an award of only $50,-000.00. The trial court awarded only $20,-000.00 in attorneys' fees, less than 20% of the actual fees incurred by the Board in defending the lawsuit. In its minute entry of May 22, 1981, awarding the Board of Regents $20,000.00 in attorneys' fees, the trial court noted the following:

> The factors which militate in favor of an award of attorney's fees to the prevailing Board of Regents are that the sum of *thirty-thousand dollars expended in defense of the contract action is reasonable* for the services rendered. (emphasis added)

Despite its conclusion that $30,000.00 was a reasonable sum for attorneys' fees incurred in defending the contract claims, the trial court, in the exercise of its discretion, awarded only $20,000.00. We find that the $20,000.00 award was proper and within the trial court's discretion. *See Sparks, supra*.

Rutledge's final claim is that the trial court was "unjustified" in awarding the Board of Regents attorneys' fees in this case in that "[Rutledge's] actions provided indirect benefits to the public and to the

defendant Board of Regents by bringing to the attention of the public, the University, and the Board of Regents many facts which were previously unknown." Additionally, Rutledge maintains that his actions encouraged a cleanup of the A.S.U. football program to the benefit of the University, its athletic department, and to the public at large.

The trial court has broad discretion in determining whether or not to award attorneys' fees pursuant to A.R.S. § 12–341.-01(A). *Associated Indemn. Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (Ariz.Sup. Ct.1985); *Grand Real Estate, Inc. v. Sirignano,* 139 Ariz. 8, 676 P.2d 642 (App.1983). As an appellate court, we will not substitute our discretion for that of the trial court if the record contains a reasonable basis to sustain the exercise of that discretion. *Wheel Estate Corp. v. Webb,* 139 Ariz. 506, 679 P.2d 529 (App.1983); *Grand Real Estate, Inc. v. Sirignano, supra.*

The trial court noted the following in its minute entry awarding the Board of Regents $20,000.00 in attorneys' fees:

> The factors which militate in favor of an award of attorney's fees to the prevailing Board of Regents are that the sum of thirty-thousand dollars expended in defense of the contract action is reasonable for the services rendered. If, as the Plaintiff contends, some collateral public benefit was derived from the bringing of the action, the suit was by no means maintained for purely altruistic purposes. The Plaintiff's unrealistic evaluation of damages tended to perpetuate and escalate the issues.

> The equitable considerations which, to some degree, offset a full award of fees are that the Plaintiff is in modest financial circumstances and is already liable for total taxable costs and jury fees in excess of $13,000.00.

We conclude that the trial court was well within its discretion in awarding the Board of Regents $20,000.00 in attorneys' fees.

## CONCLUSION

This was a long, bitter and hard-fought trial. The record indicates that the trial court did an admirable job of controlling the proceedings and ensuring that all parties obtained a fair trial. Based upon our resolution of the issues raised on appeal, the judgment of the trial court is affirmed.

The Board of Regents has requested an award of its attorneys' fees incurred on appeal. Pursuant to Rule 21(c)(1), Arizona Rules of Civil Appellate Procedure, and A.R.S. § 12–341.01(A), we award the Board its attorneys' fees, the amount of which will be determined upon the filing of the Board's statement of costs.

CORCORAN and FROEB, JJ., concur.