646 P.2d 319

George B. HALLMARK, a single man, Plaintiff-Appellant,

v.

ALLIED PRODUCTS CORPORATION, a foreign corporation; Bush Hog Continental Gin, a division or subsidiary of Allied Products Corporation, Defendants-Appellees.

No. 1 CA–CIV 5192.

Court of Appeals of Arizona, Division 1, Department A.

June 1, 1982.

Rolle, Benton & Plante by F. Keith Benton, Robert C. Clarke, Yuma, for plaintiff-appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Richard J. Woods, Phoenix, for defendants-appellees.

## OPINION

OGG, Presiding Judge.

This is an appeal by plaintiff-appellant George B. Hallmark (Hallmark) from the trial court's judgment entered on a jury verdict in favor of defendants-appellees Allied Products Corporation and Bush Hog Continental Gin (manufacturer). Hallmark's complaint alleged strict liability based on Restatement (Second) of Torts § 402A due to defective design and failure to warn of foreseeable dangers inherent in certain cotton ginning equipment sold by the manufacturer. The complaint also alleged that the particular equipment was negligently installed and supervised by the manufacturer.

On appeal, Hallmark presents four issues:

    I.  Did the trial court err in refusing to allow the introduction of evidence

of subsequent remedial measures taken by the manufacturer?

II. Did the trial court err in failing to grant a new trial based on juror misconduct?

III. Did the trial court err in refusing to admit safety standards contained in Occupational Safety and Health Administration (OSHA) regulations?

IV. Did the trial court err in instructing the jury?

We find that the trial court did not err and, accordingly, we affirm the judgment in favor of the manufacturer.

■ We begin with the well-established proposition that on appeal from a judgment entered on a jury verdict, this court must view the evidence in a light most favorable to the prevailing party and must give that party all the reasonable inferences arising from that favorable view of the evidence. *McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980); *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977).

In December of 1976, a salesman for the manufacturer met with the president and general manager of the Yuco Cotton Gin, which is located near Yuma, Arizona. A high-capacity gin with an automatic cotton press was proposed for the Yuco Gin. The cotton press is the particular piece of equipment which is the cornerstone of Hallmark's action. A summary of the operation of this equipment is necessary for disposition of this appeal.

After the farmer brings the cotton from the fields to the gin, it is put through a number of cleaning and drying processes. The cotton then moves through "gin strands" which separate the lint cotton from the cotton seed. The lint cotton is then fed from the gin strands into the cotton press.

At the rear of the cotton press is a compartment known as a "tramper". The lint cotton is compacted into the tramper and a "tramper foot" then pushes the cotton down into a rectangular box located below the floor. When this box is filled to a pre-set amount of pressure, the first cycle in the press operation is complete. A buzzer then sounds and the box rotates automatically 180 degrees from the tramper side to the press side and the corresponding box on the press side rotates back to the tramper side.

The press side is equipped with two large hydraulic rams which compress the cotton into a bale. An automatic device then straps the bale to keep it compressed. A four to five hundred pound bale is then ejected and moved away on a conveyor. As the press side is compacting the cotton into a bale, the tramper side is filled with more cotton. The machine is designed to produce up to thirty bales of cotton per hour automatically.

A partial bale of cotton, known as a "remnant", may remain after a portion of a farmer's crop is ginned and baled. These remnants must be stored and then later combined with more cotton from the same farmer to produce a whole bale. There are several methods of introducing remnants back into the ginning operation. The manufacturer recommends that the remnants be saved until the end of the season, or until times such as rainy days when the gin is not running at full capacity, and that they be combined at that time. Another method is to stop the flow of cotton into the press by raising the gin strands, place the remnants in the tramper side, and then allow the press to proceed through its automatic cycle. A third method involves use of manual controls to put the press in a semi-automatic state, thereby preventing the automatic rotation of the boxes. The gin strands are then raised and the press doors are locked open so that the remnants may be inserted into the press side.

On December 3, 1977, Hallmark and Teddy Gibson, a fellow employee at Yuco Gin, were inserting a remnant in the press side and were pushing it down into the press box with their feet. The press was on automatic cycle and only two of the four gin strands were raised. Nobody was positioned at the manual controls. The buzzer sounded, indicating that the tramper compartment was full and that the boxes were

going to rotate. Gibson then jumped out of the box and attempted to stop the press, to no avail. The boxes rotated, thereby trapping Hallmark's leg and causing the injury which is the basis of his action.

Hallmark alleged that the cotton press was defectively designed because it required the operator to insert remnants by standing on top of them, thereby pushing them below the surface of the floor. He further alleged that the press was unreasonably dangerous because it should not have been designed in a manner in which the doors to the compartments could be opened while it was possible for the compartments to rotate. He also alleged that there was inadequate warning that the press would activate itself and rotate automatically. Finally, Hallmark alleged that an employee of the manufacturer who was concerned with installation and operation of the cotton press was negligent in failing to inform him of the proper operation of the equipment.

This appeal followed the jury verdict and judgment in favor of the manufacturer. We will now address those issues raised by Hallmark.

## SUBSEQUENT REMEDIAL MEASURES

The record indicates that, subsequent to Hallmark's accident, a safety switch was installed at the manual controls which prevented the boxes from rotating when the compartment doors were open. Hallmark contends that his injury would have been prevented if this switch had been present at the time of the accident.

Hallmark attempted to introduce evidence of this "subsequent remedial measure"; however, the trial court refused to allow introduction of such evidence, relying on Rule 407, Rules of Evidence, 17A A.R.S. (Supp.1981), which provides:

Rule 407. Subsequent Remedial Measures

When, after an event, measures are taken, which if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or cul-

pable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Hallmark contends that the trial court erred in two respects. First, he argues that the evidence is admissible as to both the negligence and products liability actions because the manufacturer controverted the feasibility of such a device. Second, assuming that the feasibility of the safety device was not controverted, Hallmark argues that the evidence is admissible to prove the existence of a defect in the products liability action because Rule 407 is an exclusionary rule pertaining to negligence actions only.

Hallmark relies on the testimony of Mr. F. H. Strother, vice-president of engineering for Bush Hog Continental Gin, and Mr. Charles M. Merkel, president of Bush Hog Continental Gin, in support of his argument that the feasibility of the safety device was controverted. The pertinent portions of their testimony are set forth below.

Mr. Strother testified as follows:

Q. Isn't there a better way to [insert remnants into the press side] to insure the safety of a man down in the press box? You can't think of any?

A. There can be. This has been discussed earlier. There could have been a device or switch that would keep the boxes from rotating with the door open.

Q. So in other words there could be a device placed on this machine that when the door as depicted in this diagram is open that these boxes won't rotate?

A. That's correct.

Q. That's going to insure that the man down here in this box isn't going to have his legs cut off, isn't it?

A. If the switch does not fail, yes.

Q. Was that technology, what you have just described, was that available at the time this machine was manufactured and sold in 1977?

A. Yes.

Mr. Merkel testified as follows:

Q. At the time of the manufacture and sale of this equipment was the technology available to you to hook up a device or wire to the doors open button that would in turn be activated by a limit switch, the doors of the press which would in turn connect with the power to the motor that drives the boxes in this press and thereby keeping them from revolving when the doors were locked open?

A. Yes, such—I have heard such testimony and such a device could be provided.

Q. And do you know whether or not that would be a good device to put on to the press of this machine, the press side of this machine?

A. I don't know that I would classify it as good, bad, or indifferent. It could be done.

\* \* \* \* \* \*

Q. A simple system of an electric eye that is used on the safety gate could be utilized as a back-up system to the doors open switch, could it not?

A. To answer your question directly, yes, you can put one limit switch on top of another limit switch on top of another one until you mght create a monster that is even more lethal.

Q. You think it would make it more lethal to back up a system with a switch that might—

A. To a point where a person depends on these sorts of devices instead of keeping themselves out of dangerous situation.

Mr. John Scott Miller, serviceman for Bush Hog Continental Gin, also testified to this issue:

Q. Scotty, is there a way that a switch can be installed on press side doors and utilized in connection with the doors open button on the press and utilized in connection with the motors that cause the boxes to rotate that will prevent the boxes from rotating when the doors are locked open manually?

A. Is there a way to do it?

Q. Yes, sir.

A. I'm sure there is.

Hallmark relies on the testimony that the safety device might be subject to failure and that putting one limit switch on top of another might create a "monster" where people depend on the safety devices rather than keeping themselves out of a dangerous situation. He argues that this testimony controverts the feasibility of the safety device and that the testimony is thus admissible under Rule 407.

■ The testimony quoted above clearly admits the feasibility of the safety device. The further comments to the effect that such a device was not a total "failsafe" do not controvert the previous testimony establishing feasibility.[1] Furthermore, the trial judge has broad power to insure that remedial measures evidence is not improperly admitted under the guise of the "other purpose" exception. *See* 10 Moore's Federal Practice § 407.02 (1976). Before evidence of subsequent change may be received as relevant to a proper issue, the trial court must be satisfied that the "issue on which it is offered is of substantial importance and is actually, and not merely formally in dispute, that the plaintiff cannot establish the fact to be inferred conveniently by other proof, and consequently that the need for the evidence outweighs the danger of its misuse." McCormick, Evidence § 275(g) at 668–69 (2d ed. 1972). And if the trial court concludes that factors of undue prejudice, confusion of issues, misleading the jury or waste of time, outweigh the probative value of the evidence, he may exclude the evidence under Rule 403.[2] *See* Advisory Committee Note, Fed.R.Evid. 407.

---

1. We note that Hallmark offered the evidence solely for the purpose of establishing feasibility. The issue of whether such evidence would be admissible for impeachment purposes has not been presented to this court.

2. Rule 403, Rules of Evidence, 17A A.R.S. (Supp.1981) provides:

   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

We note that in addition to finding that there was no dispute concerning the feasibility of the device, the trial judge stated that he further relied on Rule 403 in excluding the evidence. Accordingly, we cannot say that the trial court abused its discretion in refusing to admit the evidence on this ground.

Hallmark's second argument is that Rule 407 does not pertain to products liability actions. The notes of the Advisory Committee on the Federal Rules of Evidence state that Rule 407 rests on two grounds:

(1) The conduct [incorporating subsequent remedial measures] is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence .... Under a liberal theory of relevancy this ground alone would not support exclusion as the inference is still a possible one. (2) The other, and more impressive, ground for exclusion rests on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety ....

Rule 407 excludes evidence of subsequent remedial measures when offered to prove "negligence or culpable conduct". The rule makes no express mention of products liability cases. This has led to a split of authority in jurisdictions ruling on this issue. Courts of several jurisdictions allow the admission of evidence of remedial repairs that is offered to prove the existence of a defect as part of the plaintiff's case in chief.[3] Many other courts and legislatures, however, continue to follow the traditional exclusionary rule in strict liability actions.[4]

Hallmark relies heavily on the reasoning of the Supreme Court of California in *Ault v. International Harvester Co.*, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974). The court in *Ault* emphasized that the exclusionary rule governing subsequent remedial measures is applicable only to "negligent or culpable conduct" and that there is no culpable conduct at issue in a strict products liability case because policy considerations are involved which shift the emphasis from the defendant manufacturer's conduct to the character of the product. The court further reasoned that the public policy assumptions of Rule 407 are not valid in the products liability field because the normal products liability defendant manufactures tens of thousands of units of goods and "it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement." *Id.*, 13 Cal.3d at 122, 117 Cal.Rptr. at 816, 528 P.2d at 1152.

The rationale behind Rule 407 is that people in general would be less likely to take subsequent remedial measures if their repairs or improvements would be used against them in a lawsuit arising out of a prior accident. By excluding this evidence, defendants are encouraged to make such improvements. From a defendant's point

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

3. *See, e.g., Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788 (8th Cir. 1977); *Chart v. General Motors Corp.*, 80 Wis.2d 91, 258 N.W.2d 680 (1977); *Cunningham v. Yazoo Mfg. Co.*, 39 Ill.App.3d 498, 350 N.E.2d 514 (1976); *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D.1976); *Ault v. International Harvester Company*, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974).

4. *See, e.g., Werner v. Upjohn Co., Inc.*, 628 F.2d 848 (4th Cir. 1980); *Bauman v. Volkswagenwerk Aktiengesellschaft*, 621 F.2d 230 (6th Cir.

1980); *Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir. 1979); *Roy v. Star Chopper Co., Inc.*, 584 F.2d 1124 (1st Cir. 1978); *Smyth v. Upjohn Co.*, 529 F.2d 803 (2d Cir. 1975); *Smith v. E. R. Squibb & Sons, Inc.*, 405 Mich. 79, 273 N.W.2d 476 (Mich.1979); *Haysom v. Coleman Lantern Co., Inc.*, 89 Wash.2d 474, 573 P.2d 785 (1978). *See also*, Ariz.Rev.Stat. § 12–686; Neb.Rev. Stat. § 27–407; Mich.Stat. § 27A.2946(3). *See generally*, Comment, *Federal Rule of Evidence 407 and Its State Variations: The Courts Perform Some "Subsequent Remedial Measures" of Their Own in Products Liability Cases*, 49 UMKC L.Rev. 338 (1981).

of view, it is the fact that the evidence may be used against him which will inhibit subsequent repairs or improvement. It makes no difference to the defendant on what theory the evidence is admitted (negligence or strict liability) because his inclination to make subsequent improvements will be similarly inhibited. *See Werner v. Upjohn Co., Inc.*, 628 F.2d 848 (4th Cir. 1980).

After noting the distinction between negligence and strict products liability actions, the United States Court of Appeals, Second Circuit, made the following observation:

> [T]he defendant must pay the judgment in both situations, regardless of where the jury's attention focused when they found against him. Since the policy underlying Rule 407 not to discourage persons from taking remedial measures is relevant to *defendants* sued under either theory, we do not see the significance of the distinction. A potential defendant must be equally concerned regardless of the theoretical rubric under which this highly prejudicial, . . . and extremely damaging evidence, . . . is admitted. (emphasis in original.)

*Cann v. Ford Motor Company*, 658 F.2d 54, 60 (2d Cir. 1981).

We hold that the exclusionary rule of Rule 407 applies to actions based on strict products liability.[5] We again note that although the trial court applied the exclusionary rule in this manner, it further found that Rule 403 supported exclusion of the evidence. For all the foregoing reasons, we find that the trial court did not err in excluding the evidence on either ground.

## JUROR MISCONDUCT

Hallmark contends that the trial court erred in refusing to grant his motion for new trial which was based on several acts of misconduct by one of the jurors.

The juror held a conversation with a witness concerning whether he had known her husband when the witness worked for a previous employer. The trial court was made aware of this conversation during the trial and it found the misconduct to be harmless.

The trial court was not made aware of two other incidents during the course of the trial. At the hearing on Hallmark's motion for new trial, a witness testified that he heard the juror state that she thought the matter should have been covered by industrial insurance and that she was going to look up the law. Another witness testified that the juror asked him if an employee who was hurt on the job could sue his employer and that he replied that the employee could not sue his employer. He testified that he may have said that worker's compensation covered the injury.

Where there has been misconduct on the part of a juror, the grant or denial of a motion for a mistrial is a matter within the sound discretion of the trial court. *Sanders v. Beckwith*, 79 Ariz. 67, 283 P.2d 235 (1955); *Ulan v. Richtars*, 8 Ariz.App. 351, 446 P.2d 255 (1968). The test is whether prejudice seems affirmatively probable and prejudice will not be presumed, but must appear probable from the record. *Webb v. Hardin*, 53 Ariz. 310, 89 P.2d 30 (1939); *Ulan v. Richtars, supra.*

We note that the record does not include any evidence that extraneous prejudicial information actually was improperly brought to the jury's attention or that any outside influence was improperly brought to bear upon any juror. *See* Rule 606(b), Rules of Evidence, 17A A.R.S. (Supp.1981). In view of the fact that the trial judge, after considering the facts and hearing the argument thereon, determined that no prej-

---

**5.** The Arizona legislature has addressed this issue in A.R.S. § 12–686, which provides:

> In any product liability action, the following shall not be admissible as direct evidence of a defect:
>
>     *    *    *    *    *    *
>
> 2. Evidence of any change made in the design or methods of manufacturing or test-

ing the product or any similar product subsequent to the time the product was first sold by the defendant.

The effective date of this statute is January 1, 1979. Laws 1978 Ch. 19 § 5. This statute was not in effect at the time the present action was brought.

udice resulted, we cannot affirmatively find a probability of prejudice in the record before us. Accordingly, the trial court did not err in denying the motion for new trial on this ground.

## ADMISSIBILITY OF OSHA REGULATIONS

Hallmark contends that the trial court erred in refusing to allow introduction of OSHA regulations as evidence of standards followed in the cotton gin manufacturing industry. Hallmark relies on the manufacturer's answer to an interrogatory that the regulations "are to some extent applicable" in the manufacture, installation and operation of the equipment.

■■■■ The trial court found that Hallmark had presented no evidence that the regulations constitute the standard of practice in the cotton gin manufacturing business. A trial court's rulings on the admittance or exclusion of evidence will not be disturbed on appeal unless a clear abuse of discretion appears and prejudice results therefrom. *Rimondi v. Briggs,* 124 Ariz. 561, 606 P.2d 412 (1980); *Sequoia Manufacturing Company, Inc. v. Halec Construction Co., Inc.,* 117 Ariz. 11, 570 P.2d 782 (App. 1977). We cannot say that the trial court abused its discretion in finding insufficient foundation for the admission of the evidence.

## JURY INSTRUCTIONS

Hallmark's remaining assignments of error involve the giving or the refusal by the trial judge of certain requested instructions.

The trial court gave the following instruction concerning the duty of the manufacturer to give adequate warnings or instructions concerning the safe use of the product:

If the manufacturer does not give adequate warning of the danger or if the manufacturer does not give adequate instructions with respect to the safe use of the product, the manufacturer is liable for failure to warn or instruct.

■■■■ Hallmark contends that this instruction failed to advise the jury that it could take into consideration the method utilized to convey such warnings or instructions to the user and that the trial court erred in refusing to give requested instructions to that effect. *See* Restatement (Second) of Torts § 388, Comment n (1965). Assuming that Hallmark's requested instructions are correct statements of the law on strict liability, a party is not entitled to its own instructions simply because it is a correct statement of the law. *Sequoia Manufacturing Company, Inc. v. Halec Construction Co., Inc.,* 117 Ariz. 11, 570 P.2d 782 (App.1977). As our supreme court has observed:

While instructions which go to the gist of the action, and are supported by the evidence, must be given, *Casey v. Marshall,* 64 Ariz. 232, 168 P.2d 240 (1946), it is not necessary for the trial judge to instruct on every refinement suggested by counsel. Instructions are not given to aid one side or the other in jury argument. Once the court defines in understandable language the legal principles applicable to a controversy, it is the obligation of counsel, in argument, to discuss the evidence and the applicability of the legal principles to the ultimate facts found by the jury.

*Porterie v. Peters,* 111 Ariz. 452, 458, 532 P.2d 514, 520 (1975).

■■■■ While we neither endorse nor condemn the quoted instruction, we find that it is sufficiently broad to allow counsel to argue the applicability of the legal principles to the facts of the case. The trial court did not abuse its discretion in refusing to instruct further on the subject.

■■■■ Hallmark contends that the trial court erred in refusing to instruct the jury that he was a "user" within the meaning of the law of strict products liability. He argues that there was no dispute as to this issue and thus it would be appropriate to instruct to that effect. *See Phoenix Title and Trust Company v. State,* 5 Ariz.App. 246, 425 P.2d 434 (1967).

Assuming that there was no dispute as to this issue and that it would not have been error for the trial court to give this instruction, it was not mandatory upon the court to do so. "Any instruction of this nature must be solely within the discretion of the trial court, due to his proximity to the witnesses and familiarity with their testimony." *Elliott v. Landon*, 89 Ariz. 355, 356–57, 362 P.2d 733, 735 (1961). The trial court found that the issue was adequately covered by other instructions. We find that the trial court did not err in this regard.

Hallmark further argues that the trial court erred in refusing to give a requested instruction concerning the strict liability action which stated that the manufacturer would be liable even if the jury found that it had exercised all possible care in the preparation of its product.

■■■ It is not error to refuse to give requested instructions where the concepts contained therein are adequately conveyed through given instructions. *Tucson Utility Supplies, Inc. v. Gallagher*, 102 Ariz. 499, 433 P.2d 629 (1967); *Miller v. Arnal Corporation*, 129 Ariz. 484, 632 P.2d 987 (App. 1981). The instructions given by the court adequately cover the elements of a strict products liability claim. We note that Hallmark's counsel was able to effectively discuss strict liability concepts in his argument. The trial court did not err in refusing to give this instruction.

One of Hallmark's requested instructions was modified by the addition of the statement that "[t]he manufacturer is not liable for injury caused by the misuse of the product which was not reasonably foreseeable by the manufacturer." Hallmark contends that the trial court erred in modifying the instruction because there was no evidence of misuse of the equipment.

■■■ In determining whether an instruction is justified, we must view the evidence in the strongest manner supporting the theory of the party requesting the instruction. *Schneider v. Macari*, 111 Ariz. 483, 533 P.2d 540 (1975); *Evans v. Pickett*, 102 Ariz. 393, 430 P.2d 413 (1967). If there is any evi-

dence tending to establish such theory, the instruction should be given even if contradictory facts are also presented, and it is for the jury to determine whether the facts stated are made out by the evidence. *Nichols v. Baker*, 101 Ariz. 151, 416 P.2d 584 (1966); *Reichardt v. Albert*, 89 Ariz. 322, 361 P.2d 934 (1961).

■■■ Mr. Miller testified that he told several of the Yuco Gin employees, including those responsible for instructing other employees, of three methods in which remnants could be introduced into the press which he thought were safe procedures. There is no evidence that the manufacturer instructed any Yuco Gin employee to operate the press in the manner in which Hallmark was injured. We cannot say as a matter of law that the evidence was insufficient to justify instructing the jury on the theory of misuse.

Concerning his cause of action based on negligence, Hallmark requested that the trial court give an instruction taken directly from Restatement (Second) of Torts § 388 dealing with the duty of a manufacturer to exercise reasonable care to inform users of a chattel of its dangerous condition. Hallmark objected to the refusal on the ground that no duty instruction was given. We do not agree. The trial court began its instructions on the theory of negligence as follows:

> Negligence is the failure to use reasonable care. Negligence may consist of action or inaction. A person is negligent if he fails to act as an ordinary careful person would act under the circumstances.

■■■ As we previously noted, it is the duty of the trial court to define in understandable language the applicable legal principles. It need not instruct on every refinement suggested by counsel. *Porterie v. Peters, supra*. We find that the concepts contained in the requested instruction were adequately conveyed through given instructions.

■■■ Finally, Hallmark contends that the trial court erred in refusing to give

requested instructions on the subject of proximate causation. He argues that the given instructions do not state that two or more persons may combine to cause harm and that each such person could be found liable. He further argues that the jury was not advised that it was not a defense that some other party not a party to the action was also liable. The trial court instructed the jury as follows:

A cause of an injury is any cause which in natural and unbroken sequence causes an injury and without which the injury would not occur. There may be more than one cause of an injury and more than one person may be liable for causing an injury . . . .

This instruction adequately defined the legal principles of proximate causation so as to allow counsel to discuss the applicability of these principles to the evidence.

 Instructions must be viewed as a whole and not piecemeal, the test being, upon the whole charge, whether the jury will gather the proper rules to be applied in arriving at the correct decision. *Kauffman v. Schroeder*, 116 Ariz. 104, 568 P.2d 411 (1977); *Arizona Public Service Company v. Brittain*, 107 Ariz. 278, 486 P.2d 176 (1971). When viewed in this manner, we find no error in the instructions given.

Affirmed.

CORCORAN and FROEB, JJ., concur.