897 P.2d 714

Daniel DUNN, individually; and Daniel Dunn, as Next Friend of Daniel Patrick Dunn and Warren Patrick Dunn, minors; Shawn Robert Dunn; James Fleming and Laura Fleming, Plaintiffs–Appellants, Cross–Appellees,

v.

Anca MARAS, M.D., Raymond S. Elliott, M.D., Gynecology & Obstetrics of Mesa, Ltd., Defendants–Appellees, Cross–Appellants.

No. 1 CA–CV 91–0413.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 2, 1995.

Reconsideration Denied Feb. 22, 1995.

Review Denied June 29, 1995.

**414**

Charles M. Brewer, Ltd. by Charles M. Brewer, Stuart J. Reilly, Phoenix, for plaintiffs-appellants.

Snell & Wilmer by Lonnie J. Williams, Jr., Stephen M. Hopkins, Phoenix, for defendant-appellee Maras.

Law Offices of Michael E. Bradford by Michael E. Bradford, Phoenix, for defendant-appellee Elliott.

## OPINION

FIDEL, Presiding Judge.

A juror learned outside of court that plaintiffs had settled this medical malpractice suit with a hospital before proceeding to trial against the defendant physicians alone. The trial court had ruled in limine that the jury should not be told of the settlement. Although the trial judge repeatedly admonished the jurors to inform him if they heard anything extraneous about the case, and although the trial judge made a point of asking, before releasing the jurors to deliberate, whether they had heard anything extraneous about the case, the juror in question did not tell the court what he had learned. At the outset of deliberations, however, he told the jury of the settlement and, according to one fellow juror, described plaintiffs as "greedy."

When juror misconduct puts extraneous information before the jury, a new trial must be granted if there is a reasonable possibility of prejudice. We hold that the trial court misapplied this standard and abused its discretion by denying plaintiffs' motion for new trial.

## BACKGROUND

Patricia Dunn's survivors initiated this medical malpractice suit against Samaritan Health Services; Dr. Anca Maras, an anesthesiologist at Desert Samaritan Hospital; and Dr. Raymond S. Elliott, Mrs. Dunn's obstetrician.

Patricia Dunn entered Desert Samaritan Hospital on April 18, 1984, to deliver her fourth child. Shortly after Mrs. Dunn's 7:00 a.m. admission, Dr. Elliott examined his patient and prescribed a drug to augment labor. Mrs. Dunn, at thirty-seven, was in "excellent physical condition" and had experienced a normal pregnancy. After leaving instructions that his patient could receive an epidural anesthetic or other pain medication upon request, Dr. Elliott left the hospital for his office just across the street.

At approximately 10:14 a.m., Dr. Maras, an anesthesiologist under contract with Samaritan, gave the first of two epidural injections. Shortly thereafter, Dr. Maras administered the second because the first had provided an "unequal block," affecting only one side of Mrs. Dunn's body. Hospital records reflect that at 11:00 Mrs. Dunn was "cold and jittery," short of breath, and receiving oxygen. Shortly thereafter, fetal heart tone was recorded as weak, and at approximately 11:15 Dr. Maras administered the first of several ephedrine injections to elevate Mrs. Dunn's blood pressure and the heartbeat of the fetus.

Dr. Elliott called the hospital several times during the morning to check on Mrs. Dunn's condition and, after calling at 11:15, went home to lunch, directing the hospital staff to call him at home if he was needed. At 11:35 and 11:45, Dr. Elliott received calls at home regarding problematic fetal heart tone. After the second call, as Dr. Elliott returned to the hospital, another obstetrician and anesthesiologist were summoned to assist Dr. Maras and to perform an emergency cesarean section on Mrs. Dunn.

The parties dispute whether Mrs. Dunn herself experienced significant distress before noon; defendants claim that only the fetus had significant distress before that time. By 12:05 p.m., however, as she was wheeled to the delivery room, Mrs. Dunn was "cyanotic—no response, pupils dilated." By 12:15, when Dr. Elliott arrived, the cesarean had been performed, the infant had been saved, the surgical incision was being closed, and several doctors, including Dr. Maras, were attempting to revive Mrs. Dunn from full cardiac arrest. Though she was eventually revived, Mrs. Dunn had suffered severe brain damage and spastic paralysis and remained institutionalized for the balance of her life.[1]

Before trial, Samaritan settled with plaintiffs for 2.6 million dollars. After dismissing Samaritan, the trial court ordered the remaining parties to avoid "any reference to the settlement." Plaintiffs tried their case against Dr. Maras on the theory that she negligently administered Mrs. Dunn's epidural injection, caused a subdural anesthesia, and critically exacerbated that condition by misdiagnosing and improperly treating Mrs. Dunn's response. Plaintiffs contended that Dr. Elliott contributed to Mrs. Dunn's injuries because his inaccessibility amounted to abandonment and deprived his patient of the chance for timely diagnosis and effective relief.

Both defendants denied causing Mrs. Dunn's injuries or her death. Dr. Maras asserted that Mrs. Dunn's condition stemmed not from a mishandled epidural but from an unrelated malady known as amniotic fluid embolism syndrome ("AFE")—a condition that results when amniotic fluid enters the mother's circulatory system during labor and triggers an allergic reaction, a toxic constriction of blood vessels in the lungs that prevents oxygenation of the blood.

According to Dr. Maras's expert, AFE is "unpreventable," is for the most part "untreatable," and occurs in 1 in 8,000 births. According to plaintiffs' expert, AFE occurs in only 1 in 80,000 births and should not be diagnosed unless anesthetic causes are ruled out. Whether Mrs. Dunn suffered from AFE was the paramount issue in plaintiffs' case against Dr. Maras; Dr. Maras's attorneys conceded in opening statements that their client would accept liability if the jury found that a mismanaged epidural was the cause of Mrs. Dunn's collapse.

Dr. Elliott did not engage in the dispute over whether Mrs. Dunn suffered from AFE or a mismanaged epidural; instead he argued that his absence from the hospital did not cause or contribute to her injuries in either event.

At the close of the evidence, the trial court gave the jury a general verdict form labelled "verdict" and a special interrogatory labelled "special verdict." The general verdict, signed by nine of the twelve jurors, provided:

---

1. Mrs. Dunn died in 1989, shortly after surgery for breast cancer, when she aspirated her gastric contents into her lungs and developed aspiration pneumonia. Plaintiffs submitted expert testimony, disputed by defendants, to the effect that her spastic paralysis prevented timely diagnosis of her cancer and also caused the fatal aftermath of cancer surgery.

We, the Jury, duly empaneled and sworn in the above entitled action, upon our oaths, do find for the Defendants, Anca Maras, M.D.; Raymond S. Elliott, M.D.; and Gynecology and Obstetrics of Mesa, Ltd.; and against the Plaintiffs....

The special interrogatory, signed by the same nine jurors, stated:

We, the jury, duly empaneled and sworn in the above entitled action, upon our oaths, do hereby determine the following questions of fact:

(1) The collapse of Patricia Dunn on 18 April, 1984, was caused by a mismanaged epidural resulting in a high subdural anesthetic. [ ]

or

(2) The collapse of Patricia Dunn on 18 April, 1984, was caused by an amniotic fluid embolism.

The jury entered "yes" after the second option.

Plaintiffs moved to set aside the verdict and for a new trial, alleging juror misconduct as one of multiple grounds. The trial court denied the motion, and plaintiffs timely appealed. For the reasons that follow, we find that the trial court abused its discretion in denying the motion for new trial.[2]

## PRELIMINARY ISSUES

Before turning to the dispositive issue of juror misconduct, we address three other issues raised by plaintiffs that are likely to recur.

### A. Special Interrogatory

■ The trial court submitted a general verdict form and a special interrogatory, misdesignating the latter a "special verdict."[3]

In the special interrogatory, the court asked the jury to indicate whether Mrs. Dunn's collapse was caused by "a mismanaged epidural resulting in a high subdural anesthetic" or "by an amniotic fluid embolism." Plaintiffs' counsel initially accepted the wording of the interrogatory but later objected. He argues on appeal that, by emphasizing the claim that Mrs. Dunn's collapse had resulted from a mismanaged epidural, the interrogatory effectively eliminated all claims against Dr. Elliott and several viable claims against Dr. Maras, including claims that she administered improper drugs, failed to take appropriate lifesaving measures, and permitted Mrs. Dunn to be transported to the delivery room in a life-threatening position.[4]

■ We find no error in the trial court's submission of the special interrogatory, which set forth the only theory of causation presented to this jury. Plaintiffs did claim that Dr. Maras fell below the standard of care in various respects when Mrs. Dunn's condition began to decline. Yet the battle over causation was restricted to the question whether her decline was triggered by a mismanaged epidural or AFE. Dr. Maras conceded from the outset that, if the former were the cause, she was responsible for Mrs. Dunn's cardiac arrest and spastic paralytic state. Conversely, plaintiffs never argued that a more careful response by Dr. Maras would have made a difference if AFE were the cause of Mrs. Dunn's collapse. Accordingly, the special interrogatory did not eliminate any of plaintiffs' claims against Dr. Maras; it simply identified the causal issue at the core of plaintiffs' claims.

Similarly, the special interrogatory did not impair plaintiffs' case against Dr. Elliott. Plaintiffs argued that if Dr. Elliott had ade-

---

2. Dr. Maras has cross appealed the trial court's denial of her claim to be reimbursed for certain costs. Our remand for new trial moots the cross appeal.

3. A special verdict replaces a general verdict and is designed to resolve all the factual issues in a case, permitting the trial court to reach a legal conclusion. *Dessauer v. Memorial Gen. Hosp.*, 96 N.M. 92, 628 P.2d 337, 340 (Ct.App.1981). A special interrogatory, by contrast, seeks an answer to a single factual question necessary to resolve one issue in a case. *Id.*

4. Plaintiffs attempt to support their argument by invoking counsel's memory of a question that the jury posed to the trial court during deliberations. Because neither the question nor the court's response was preserved for the record and because counsel did not take the route our rules provide to correct an omission from the record, the matter is absent from our record, and we may not consider it. *See* Ariz.R.Civ.App.P. 11(e), 17B Ariz.Rev.Stat.Ann.; *c.f. Harrington v. Beauchamp Enters.*, 158 Ariz. 118, 120, 761 P.2d 1022, 1024 (1988).

quately supervised Mrs. Dunn's care, he would have diagnosed the high subdural anesthetic earlier, giving Mrs. Dunn a better chance for survival. They did not argue that his attendance would have made a difference if the cause of his patient's collapse were AFE.

In short, the trial court did not abuse its discretion in submitting its special interrogatory; to the contrary, the interrogatory helped focus the jury's attention on the causal issue that the parties had defined as dispositive of the case.

### B. Impeachment of Dr. Maras

Dr. Maras testified that she had not been investigated or placed on supervision by Desert Samaritan in response to her treatment of Mrs. Dunn. The trial court denied plaintiffs' request to impeach Dr. Maras with a suspension and supervision letter from Desert Samaritan Hospital dated July 6, 1984, and permitted only restricted impeachment with a letter of concern from the Arizona Board of Medical Examiners ("BOMEX") dated December 27, 1984. Samaritan's letter upheld Dr. Maras's summary partial suspension and supervision until she successfully completed update training in advanced cardiac life support. BOMEX's letter expressed concern with Dr. Maras's "failure to recognize cardiovascular collapse in patient P.D."—Patricia Dunn—but noted that Dr. Maras had subsequently completed update training and had been removed from supervised status.

Dr. Maras objected to reference to her partial suspension and supervision at Desert Samaritan on the ground that it involved matters collateral to the case of Mrs. Dunn. The trial court sustained her objection, excluding the Samaritan letter altogether; permitting introduction, for purposes of impeachment, of that portion of the BOMEX letter that indicated Dr. Maras had been investigated; excluding BOMEX's expression of concern over the treatment of Mrs. Dunn; and excluding BOMEX's reference to Desert Samaritan's requirement that Dr. Maras undergo supervision and training in the management of cardiovascular collapse. The trial court observed that plaintiffs had made no

offer of proof to counter the objection that Samaritan's partial suspension and training requirement involved matters collateral to Mrs. Dunn's case. The trial court also commented that the jury might unduly emphasize or defer to BOMEX's expression of concern over the treatment of Mrs. Dunn.

■ We find no abuse of discretion. We have already commented that the determinative causal issue in the claim against Dr. Maras was not how she responded to Mrs. Dunn's cardiovascular collapse but, rather, whether that collapse was triggered by a mismanaged epidural injection or by AFE. The trial court correctly concluded that the disciplinary aftermath of Dr. Maras's cardiovascular management was collateral and risked distracting the jury.

### C. Abandonment Instruction

Plaintiffs argue that the trial court impaired the presentation of their case against Dr. Elliott by refusing to instruct the jury on a physician's abandonment of his patient. Plaintiffs sought the following instruction:

The unwarranted abandonment by a medical practitioner of a case after he has undertaken treatment is a wrong for which he can be liable. If you find from the evidence that the physician-patient relationship existed in this case, that the situation required continued medical care, and that defendant, without giving the patient reasonable notice to enable him to secure proper treatment elsewhere, abandoned the patient when he knew or ought to have known, in the exercise of reasonable care, of this need for continued care, you may find him liable for any resultant damage.

Dr. Elliott objected that reference to abandonment might inflame or confuse the jury and that it sufficed to instruct the jury on standard of care. The trial court sustained the objection, observing that plaintiffs' instruction was more appropriate to a case of "unilateral non-consensual termination" than to the case at hand. The trial court observed that its standard of care instruction would

adequately and more effectively cover the issues.[5] We agree.

■ When a party has properly requested an instruction, the trial court must give that instruction if:

(1) the evidence presented supports the instruction,

(2) the instruction is proper under the law, and

(3) the instruction pertains to an important issue, and the gist of the instruction is not given in any other instructions.

*DeMontiney v. Desert Manor Convalescent Ctr.*, 144 Ariz. 6, 10, 695 P.2d 255, 259 (1985).

■ The trial court did not err in refusing plaintiffs' abandonment instruction because the instruction did not fit the evidence. Plaintiffs' instruction depicted severance of a medical relationship at a critical time. The evidence concerned not severance but inaccessibility at a critical time. The trial court was not obliged to rewrite plaintiff's proposed instruction in a more suitable form. *See Watson Constr. Co. v. Amfac Mortgage Corp.*, 124 Ariz. 570, 583, 606 P.2d 421, 434 (App.1979). Under the circumstances, the trial court did not err in concluding that its standard of care and negligence instructions adequately permitted plaintiffs to argue their case. *See Bell v. Maricopa Medical Ctr.*, 157 Ariz. 192, 196, 755 P.2d 1180, 1184 (App. 1988).

## JUROR MISCONDUCT

Plaintiffs assert that, because jurors William Roberts and Dean Blankenship brought extraneous, prejudicial information into jury deliberations, the trial court should have granted a new trial. "[W]e will not set aside the trial court's denial of a motion for a new trial based on alleged juror misconduct absent a clear abuse of discretion." *Brooks v. Zahn*, 170 Ariz. 545, 549, 826 P.2d 1171, 1175 (App.1991).

Juror Roberts informed other jurors during deliberations that plaintiffs had settled with Samaritan for more than two million dollars. Juror Blankenship, after answering during voir dire that he had no prior knowledge of AFE, told the jury that he had studied AFE in a junior college class, that plaintiffs' expert was clearly wrong, and that AFE was far more common than most people thought. Because we find that juror Roberts's misconduct necessitates a new trial, we do not address the conduct of juror Blankenship.

### A. Background

On the eve of jury deliberations, the trial court readmonished and then questioned the jury:

I have been giving you admonitions and probably if I called upon you randomly each one probably could recite it word for word. My admonition you probably hear it in your sleep. In any event I will give it to you again.

That you are not to discuss the case among yourselves. You are not to permit anyone else to discuss the case with you.

\* \* \* \* \* \*

[S]hould any of you inadvertently hear or see something about the case in the news media then you are to report the matter immediately to me.

\* \* \* \* \* \*

*Have any of you . . . heard anything or seen anything about this case, anything that you would connect to the case with respect to any of the parties in the case, any of the matters of this case?*

\* \* \* \* \* \*

The record may so reflect that none of the jurors either responded audibly or physically to indicate their answer would

---

**5.** The standard of care instruction provided:.
  Plaintiffs claim that Dr. Maras and Dr. Elliott were at fault. Fault is negligence that was a cause of plaintiffs' injuries. Negligence is the failure to use reasonable care. Negligence

may consist[] of action or inaction. Negligence is the failure to act as a reasonably prudent anesthesiologist or obstetrician would act under the circumstances.

be other than in the affirmative [sic] with respect to having seen any material.

(Emphasis added.)

■ Rule 606(b), Arizona Rules of Evidence, 17A Ariz.Rev.Stat.Ann. ("A.R.S.") (1994 Supp.), prohibits the trial court from accepting evidence concerning the mental processes of any juror or the effect on the jury of information received in the course of deliberations.[6] The rule, however, permits evidence, including jurors' affidavits, "on the question whether extraneous prejudicial information was improperly brought to the jury's attention." *Id.*

■ Pursuant to Rule 606(b), plaintiffs attached affidavits to their motion for a new trial, indicating that juror Roberts learned of plaintiffs' 2.6 million dollar settlement with Samaritan and disclosed it to the jury in violation of the trial court's admonition. In Roberts's affidavit, he corroborates that he withheld his knowledge of the settlement from the trial court, concedes that he may have discussed the settlement during jury deliberations, but doubts that he did so. Other jurors state expressly, however, that Roberts disclosed the settlement during deliberations.

Roberts's affidavit states in relevant part:

4. After talking with Dr. Maras' lawyer ... I remembered that during the trial, I was told that there was a settlement. I learned this from a neighbor.... After my neighbor made the remark, he was told to be quiet because I was not supposed to hear anything about the case. At the time, about one week before the jury began deliberating, I did not feel what I was told by my neighbor was a "big enough deal" to tell Judge Nastro about.

5. I do not believe I told anyone else on the jury about the settlement during jury deliberations, and although I am sure I did not mention this before the jury deliberations, it is possible that I might have during jury deliberations. I believe, but I am not sure, that if I mentioned a settlement, it was after the deliberations. The fact that there may have been a prior settlement, however, had absolutely no bearing whatsoever on my decision to find against the plaintiffs.[7]

6. I rode home after deliberations with Jacqueline Tenassee [sic] and Harry Schultz and that may have been when the possibility of a settlement was discussed.

Juror Jacqueline Tenasse's two affidavits paint a different picture. In the first, she avows that

Bill Roberts directly stated to me "that the Dunns were greedy because they had already received over $2,000,000.00 from the hospital for their damages and that their actions in attempting to sue Drs. Maras and Elliott were just plain greedy." Mr. Roberts stated to me during the deliberations that he knew the Dunns had received a substantial settlement from the hospital.

In a second, clarifying affidavit after reading Roberts's affidavit, Mrs. Tenasse states

1. That I have read the affidavit of William E. Roberts.

2. That Mr. Roberts' statements that the Dunns were "greedy" because they had already received over $2,000,000.00 as the result of a settlement with the hospital all

---

6. Rule 606(b) provides in full:

   **(b) Inquiry into validity of verdict in civil action.** Upon an inquiry into the validity of a verdict in a civil action, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict, or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any* juror. Nor may a juror's affidavit or evidence of any statement by the juror, concerning a matter about which the juror would be precluded from testifying, be received for these purposes.

   (Emphasis added.)

7. We must disregard the last sentence of paragraph 5 because it violates Rule 606(b)'s prohibition against evidence concerning jurors' mental processes. *See Kirby v. Rosell,* 133 Ariz. 42, 46, 648 P.2d 1048, 1052 (App.1982). We similarly disregard portions of other juror affidavits that violate Rule 606(b).

took place during the deliberations before the verdict was reached.

3. Mr. Roberts' statements which I mentioned in my affidavit did not occur in the ride home. . . .

Another juror, Harry Schultz, states:

[D]uring the course of our deliberations, Bill Roberts stated that the hospital was no longer in the lawsuit because it had previously reached a settlement of the case with the Dunns.

And juror Sean Ryan likewise states:

During our jury deliberations, William Roberts mentioned to us that he had found out that the Dunns had settled with the hospital before the trial.

The affidavits establish that juror Roberts brought extraneous information before the jury. We must therefore examine the standard that governs whether plaintiffs are entitled to a new trial.

### B. Legal Standard

The trial court denied plaintiffs' motion for new trial because the court did not find it "reasonably possible" that the jury's knowledge of the settlement "prejudiced or improperly influenced the jury in their deliberations." Defendants argue that the court applied the wrong legal standard but rendered the right decision. Plaintiffs argue that the court expressed the right standard but misapplied it.

Arizona courts have articulated two standards to determine whether juror misconduct warrants a new trial under Ariz.R.Civ.P. 59(a)(2), 16 A.R.S. According to one set of cases, the trial court should examine whether "there is a reasonable possibility of prejudice." *Kirby v. Rosell*, 133 Ariz. 42, 45, 648 P.2d 1048, 1051 (App.1982); *see also State v. Poland*, 132 Ariz. 269, 283, 645 P.2d 784, 798 (1982); *State v. Lang*, 176 Ariz. 475, 482, 862 P.2d 235, 242 (App.1993). According to another, the trial court should examine whether prejudice is "affirmatively probable." *Hallmark v. Allied Products Corp.*, 132 Ariz. 434, 441, 646 P.2d 319, 326 (App.1982), *cited in Catchings v. City of Glendale*, 154 Ariz. 420, 422–23, 743 P.2d 400, 402–03 (App.1987); *see also Brooks v. Zahn*, 170 Ariz. at 549, 826

P.2d at 1175. Plaintiffs argue for the former, defendants for the latter. Although the cases seem at first to establish conflicting standards, they do not: the first line of cases involved jurors who placed extraneous materials before the jury; the second line involved other forms of jury misconduct.

In *State v. Poland*, our supreme court reversed a criminal conviction because one juror informed others during deliberations that defendant had been convicted and sentenced to prison in a prior proceeding. 132 Ariz. 269, 645 P.2d 784. The court defined its standard for evaluating the impact of extraneous information as follows:

Not all extraneous information is so prejudicial as to require reversal. The standard enunciated by the Ninth Circuit is that the defendant is entitled to a new trial if it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict. We adopt the reasonable possibility standard applied by the Ninth Circuit as an appropriate balancing test and in harmony with the standards applied in other circuits.

*Id.* at 283, 645 P.2d at 798 (internal citations omitted).

In *Kirby* this court considered and rejected the argument that the *Poland* standard applied only to criminal verdicts. 133 Ariz. at 45, 648 P.2d at 1051. The *Kirby* trial court granted a new trial because a juror had consulted a business law textbook and informed other jurors of certain definitions relating to the case. Although the appellant could not prove prejudice, we held that he was not required to do so. Finding that the *Poland* standard applied to both civil and criminal cases, we held that:

extraneous material considered by the jury may be deemed prejudicial without proof of actual prejudice if it relates to the issues of the case and there is a reasonable possibility of prejudice.

*Id.*

In several subsequent juror misconduct cases we have stated that prejudice will not be presumed and must be affirmatively probable from the record to warrant a new trial. In none of these cases, however, was extra-

neous information placed before the jury; and in none of these cases did we discuss, much less reject, the *Poland/Kirby* standard.

In *Hallmark*, a juror tried to obtain legal information to help her decide the case, but the record did not suggest that she actually brought extraneous information to the jury's attention. 132 Ariz. at 441, 646 P.2d at 326. We affirmed the trial court's denial of a new trial on the ground that the moving party did not establish an affirmative probability of prejudice. *Id.* at 441–442, 646 P.2d at 326–27. In *Catchings*, a juror falsely concealed during voir dire that he was twice married, twice divorced, and the father of four children. 154 Ariz. at 422, 743 P.2d at 402. We again affirmed denial of a new trial on the ground that the moving party had not established an affirmative probability of prejudice. *Id.* at 422–23, 743 P.2d at 402–03. In *Brooks*, a nurse revealed her profession during voir dire, later stated her opinions during deliberations concerning the propriety of medical treatment in the case, and also informed the jury of her husband's experience with an illness similar to plaintiff's. 170 Ariz. at 548, 826 P.2d at 1174. Our court reiterated the *Catchings* formulation that probable prejudice must be shown when a juror has responded untruthfully during voir dire, but found that this juror had responded truthfully. *Id.* at 549, 826 P.2d at 1175. As for the information that she shared with the jury, we found that it was not extraneous information, but rather life experience and learning that a juror may appropriately share. *Id.* at 552, 826 P.2d at 1178.

Because no extraneous information was placed before the jury in any of these cases, in none was the court required to review the *Poland/Kirby* standard. We therefore reject defendants' argument that *Kirby* is an aberrational departure from the requirement in civil cases that an affirmative probability of prejudice be shown before any form of juror misconduct warrants a new trial. First, as we have indicated, *Kirby* is the only Arizona appellate decision to expressly consider the appropriate standard when extraneous material is placed before a civil jury. Second, no subsequent decision has criticized or rejected *Kirby*. And third, our supreme court recently cited *Kirby* with approval for the proposition that,

> where a member of the *jury* brings to the deliberations extraneous material, information, or communications regarding the issues in the case, the reasonable possibility of prejudice to either litigant may be grounds for a new trial.

*Perkins v. Komarnyckyj*, 172 Ariz. 115, 117, 834 P.2d 1260, 1262 (1992).

Although the supreme court sought only analogous, not direct, support from *Kirby* in *Perkins* (where extraneous *judicial* contact with the jury necessitated a new trial), the supreme court explained the liberal "possibility" standard in terms that apply equally to cases such as ours:

> [W]e cannot require a litigant to show the extent of prejudice resulting from an error when, as a practical matter, the nature of the error renders it impossible to prove the extent of any prejudice.

*Id.* at 119, 834 P.2d at 1264.[8]

When extraneous information has been placed before a jury, it is indeed "impossible to prove the extent of any prejudice," *id.*, because Rule 606(b) prohibits consideration of a juror's evidence concerning the effect of extraneous information "upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict, or concerning the juror's mental processes in connection therewith." Ariz.R.Evid. 606(b). We therefore reaffirm that in extraneous information cases, whether civil or criminal, the *Poland/Kirby* reasonable possibility standard applies.

---

**8.** More recently, in a criminal context, the court added,

"The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." The danger of compromising this integrity is never greater than when the process is contaminated by outside influences. *State v. Miller*, 178 Ariz. 555, 557, 875 P.2d 788, 790 (1994) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965)) (internal citations omitted).

## C. Application

The trial court concluded, as we do, that a new trial was warranted if there were a reasonable possibility that the jury had been prejudiced by Roberts's comments. But the trial court found no reasonable possibility of prejudice. The trial court reasoned that evidence of a settlement might have cut in favor of plaintiffs, not defendants:

> [S]ettlement is a sword that cuts two ways. It can be taken as consciousness of liability on the part of Samaritan Health Services, thus tainting the remaining Defendants. It can also be taken as being exculpatory of the remaining Defendants, the inference being that the party responsible for Plaintiffs' damages chose to settle out of court.

The court also reasoned that any prejudicial tendency of Roberts's remarks would have related to damages, an issue the jury did not reach:

> More importantly, however, is the fact that the great majority of the evidence in this case was presented on the issue of causation. The jury made a specific finding that Patricia Dunn's damages were caused not by a subdural anesthesia but by amniotic fluid embolism. Juror Roberts' remarks, strictly speaking, went to *damages*. It would be sheer speculation by this Court to find that juror Roberts' statement may have been a factor in the jury deciding the special verdict and reaching a defense verdict, given the facts of this case and the emphasis during trial on proving and disproving causation.

The trial court indicated that Rule 606(b) required it to ignore those portions of several juror affidavits that related "the affiant juror's mental processes" or that speculated "as to the effect of the Blankenship and Roberts statements upon other jurors." But the trial court added, by way of aside,

> However, it is interesting to note that no juror states that his verdict would have been otherwise but for the Blankenship and Roberts statements.

For the reasons that follow, we hold that the trial court erred in its application of the reasonable possibility standard.

First, though it may have been interesting to note, the trial court was obligated to ignore evidence that none of the jurors claimed to have been affected by Roberts's revelation of the settlement. Just as the parties were precluded from submitting such evidence to the trial court, the trial court was also precluded from drawing any negative inference from the absence of such evidence.

We next consider the trial court's reflection that evidence of settlement can cut both ways. Jurors might indeed have taken Samaritan's settlement as a concession of the liability of the defendant doctors. But jurors might equally have taken the settlement as an indication that the only culpable party had settled.

> It is well understood by lawyers and judges experienced in such matters that in a case where evidence is offered of the payment of a substantial sum for a covenant not to sue, the jury considers it evidence that the covenantee is the party responsible for the injury, and that defendant or defendants should be exculpated.

*Egurrola v. Szychowski,* 95 Ariz. 194, 199, 388 P.2d 242, 245 (1964) (quoting *De Lude v. Rimek,* 351 Ill.App. 466, 115 N.E.2d 561 (1953)). Alternatively, jurors might have concluded that plaintiffs had achieved a substantial settlement from an institutional defendant and were merely overreaching by pursuing the individual doctors. It would be speculative to suggest that members of the jury drew one rather than another of these conclusions, but it is not speculative to recognize the possibility that they might have drawn any of these conclusions.

It was plaintiffs who moved in limine before trial to exclude reference to the Samaritan settlement, and it was defendants who objected. The reasonable possibility of prejudice that led the trial court to grant plaintiffs' pretrial motion had not vanished by trial's end. Although we share the trial court's post-trial assessment that evidence of settlement can cut either way, the trial court failed to follow this point to its conclusion. Because such information can cut either way, the trial court should have recognized the

reasonable *possibility* that it cut against the plaintiffs.

We come last to the trial court's explanation that, if Roberts's revelation of a settlement had any prejudicial tendency, the prejudice was probably confined to damages, an issue the jury did not reach.[9] We disagree. As indicated above, Roberts's disclosure of Samaritan's settlement might have led some jurors to conclude either that the only culpable defendant had settled, *see id.*, or that the plaintiffs were overreaching by continuing the case. By either means, the information might reasonably have shaped the jury's conclusion on causation. Plaintiffs were not obliged to show an affirmative probability of such an effect; they were obliged to show only a reasonable possibility. They did so, and the trial court erred by denying their motion for new trial.

### CONCLUSION

When juror affidavits demonstrate that "extraneous prejudicial information was improperly brought to the jury's attention" and there is a reasonable possibility that the verdict was tainted, the trial court must order a new trial. *Kirby*, 133 Ariz. at 43–45, 648 P.2d at 1049–51. Here the trial court overlooked a reasonable possibility of prejudice. Because the trial court abused its discretion in denying plaintiffs a new trial following revelation of juror Roberts's misconduct, we reverse the judgment and remand for new trial.

CONTRERAS and TOCI, JJ., concur.

9. The trial court's theoretical severance of deliberation on damages from deliberation on causation conflicts with our supreme court's approach in *Perkins*. There the jury had already decided the question of liability in favor of plaintiffs when it sent a question to the trial judge asking whether only the jurors who favored liability should set the amount of damages. 172 Ariz. at 116, 834 P.2d at 1261. The trial judge erroneously answered in the affirmative. This court affirmed the judgment on liability and remanded for retrial on damages alone. But the supreme court rejected severance of the issues, recognizing that "[a] jury's decision on an issue is not final until its verdict is accepted by the trial court" and that, prior to acceptance, the jury may reconsider and change its decision on any issue based on discussions of damages. *Id.* at 119, 834 P.2d at 1264. Finding that the error had deprived the parties of the fundamental right to an impartial trial by jury on every issue, the court remanded for a new trial on damages and liability as well.